**George SEWELL, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (CITY OF PHILADELPHIA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 25, 2000.

Decided Jan. 26, 2001.

Reargument Denied En
Banc April 4, 2001.

Albert L. Deutsch, Philadelphia, for petitioner.

Sandra L. Jacques, Philadelphia, for respondent.

Before SMITH, Judge, KELLEY, Judge and RODGERS, Senior Judge.

SMITH, Judge.

George Sewell petitions for review of an order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ) denying his claim petition. The essence of Sewell's argument is that the WCJ's decision is not supported by substantial evidence because he mischaracterized Sewell's testimony and the testimony of the medical expert for the City of Philadelphia (Employer). Sewell filed a claim petition on July 26, 1995, alleging that he suffered pain to his left hip, left groin and left leg on November 9, 1994 while moving heavy machinery in his work as an industrial process maintenance mechanic for Employer. Sewell also filed a penalty petition alleging that Employer refused to provide him with medical treatment at its clinic after he had reported his injury.

Sewell first testified before the WCJ on October 18, 1995 that he sustained an injury while working for Employer in 1988. He was on a 12–foot ladder and straddling a 10–inch line while repairing a gear valve when the ladder fell. When Sewell tried to walk he felt pain in his left hip and groin. He missed several weeks of work, attended therapy and then returned to full duties. Sewell suffered another injury at work in 1991 when he slipped after stepping on compressor oil which had leaked from a water cooler and caught his weight with his left leg. Sewell missed work with

left hip and groin pain, but he returned to full duties after several weeks of treatment by Employer's physicians.

Sewell testified that his duties changed in the summer of 1993 because Employer was upgrading its plant. Sewell's new duties involved repetitive movements of heavy machinery, and he began to notice pain in his hip and groin area in the afternoons of his workdays. Sewell described the events of November 9, 1994 as follows:

That date I was moving some—excuse me—some valves, and it was into our new storeroom—into our new place.

And I had the—a shaft that I wanted to get out of the way because it was in my way. And I went to lift this shaft up so that I could possibly get something to pick it up.

And I'm there—and I picked it up and something happened....

. . . .

Oh, okay. This is what happened. I mean, I felt the pain in the—in the groin area, in the leg area, and in the back—lower back, I could feel. You know, I felt something there, but I just felt it. I know it was not comfortable.

N.T. October 18, 1995 at pp. 24–25. Sewell testified that the next morning he experienced debilitating pain when he began to work; he reported the problem to his supervisor but he was denied treatment at Employer's clinic. Sewell attempted to continue working but his pain persisted; he ceased working in January 1995. Sewell testified that he continues to suffer disabling pain in his hip and in his groin area that interferes with his daily activities.

Employer presented the deposition testimony of its Safety Officer, Barbara Raimo, who is the case manager for injuries for all employees in the water department. Raimo testified that on November 10, 1994,

Sewell requested treatment from the clinic and told her that his hip was bothering him. When she asked him the cause of the hip pain, he told her that it was a recurrence of his old injury from 1991. When she repeatedly asked him how he injured himself, he replied that there was no new injury. Sewell's employee injury report described the 1988 incident in the space provided for detailing how the employee was injured; Raimo wrote on the report that Sewell was claiming recurrence of a May 1991 injury, and she denied medical treatment.

In his November 1996 deposition, Sewell explained:

There was no accident in 1994. I just had a reoccurrence—it just hurt so bad, I just couldn't work no more. I was moving some equipment and we had been working for quite a while revamping the shop, and after a while it just accumulated on me. It just added up and I couldn't work anymore. I mean, it hurt bad.

. . . .

There was no accident in '94. I was just working and it started hurting real bad. And I just couldn't work no more. It was pretty excruciating pain in my back and my hip.

. . . .

It was not an accident. I was moving a piece of equipment with the crane, and I made a move and was trying—it was heavy stuff, and I felt something. That's all it was, but not an accident.

Deposition of Sewell at p. 6–8.

Sewell presented the expert medical testimony of his treating physician, Dr. Brent Weinerman. Dr. Weinerman initially treated Sewell for a strain and sprain, but his final diagnosis was traumatic work-related degenerative disease of the left hip. Dr. Weinerman opined that Sewell is un-

able to return to work and that his impairment is directly related to the November 1994 incident. Dr. Weinerman based this conclusion in part on a comparison of Sewell's 1988 x-ray films, which showed no evidence of degenerative changes in his left hip, with his 1995 x-ray films, which showed moderate levels of arthritis.

Employer presented testimony from Dr. Gary W. Muller, who diagnosed Sewell with degenerative joint disease of the left hip. Dr. Muller testified:

> Basically, nobody really knows why these patients develop degenerative joint disease, some people feel the [etiology] is trauma in early life, other people feel that it's related [to] repetitive trauma to a joint. In this fellow's case, he's had multiple injuries to his left hip. He had some preexisting arthritis to his left hip. He had some preexisting arthritis from the start and he probably aggravated some of it. So it's probably a combination of things. And that he had some preexisting arthritis *and he has aggravated it a bit by the type of work that he does.*

Deposition of Dr. Muller at p. 18 (emphasis added).

Regarding the November 1994 incident, Dr. Muller testified as follows: "I think it, you know, aggravated his condition, but at that time, you know, the mechanism and what was described probably, you know, should have resolved. And basically, patient was back to his baseline, you know, of this preexisting disease." *Id.* at p. 20. However, on cross-examination Dr. Muller testified:

Q. All of you [doctors who have treated Sewell] seem to be in agreement that repetitive trauma can cause and can [set off] a progressive degeneration; is that correct?

A. That's correct.

Q. And by repetitive trauma we're talking about the traumas at work as outlined in your report the one in '88, the one in '91, the one in '94; is that correct?

A. That's correct.

Q. So what we have is a series of repetitive traumas at work to the hip that has set in motion this progressive degenerative process?

A. That basically is it, yes.

Q. But for the traumas, very likely he would not have had the progressive onset of degeneration; is that correct?

A. They added to it for sure. There could be some, but definitely they have added to it.

Q. And by aggravating a condition, which all three of these traumas did, what we're talking about is actually the three A's, aggravating, accelerating, activating; is that correct?

A. That is correct.

Q. And would you tell the judge what you mean by the traumas accelerating the condition?

A. Well, basically, if you have [underlying] degenerative joint disease and you get trauma to a joint, it can, and in a large majority of the cases, cause the degenerative disease to hasten or speed up over time.

Q. And when you have three separate traumas at work, such as you have described in your report, that's exactly what happens, it speeded up this process and set it in motion, correct?

A. That's correct.

*Id.* at pp. 24–25. Dr. Muller opined that Sewell could perform light-duty work.

The WCJ determined that Sewell's deposition testimony, where he "admitted that there was no specific work incident in 1994 and stated that his symptoms were a continuation of problems from prior inju-

ries in 1988 and 1991," was "in direct contradiction to [Sewell's] testimony at the October 18, 1995 hearing, in which [Sewell] described an injury to his left leg and groin after attempting to lift a shaft." WCJ's decision, Finding of Fact No. 15, at p. 5. Relying upon this discrepancy, the WCJ concluded that Sewell's testimony did not credibly establish that he sustained a disabling work injury on November 9, 1994. The WCJ also concluded that Dr. Weinerman's testimony did not persuasively establish that Sewell sustained a disabling work injury in November 1994. The WCJ found credible the testimony of Raimo and Dr. Muller and denied Sewell's claim and penalty petitions.

■ The Board concluded that the WCJ's findings were supported by substantial, competent evidence and should not be disturbed on appeal. The Board agreed with Sewell's argument that Dr. Muller's testimony established that his several work injuries caused his degenerative disease to accelerate. However, the Board concluded that Dr. Muller's testimony was not competent because he relied upon a history supplied by Sewell, whom the WCJ did not credit. Accordingly, the Board affirmed the WCJ's decision. This Court's review is limited to determining whether necessary findings of fact are supported by substantial evidence on the record as a whole, whether an error of law was committed or whether constitutional rights were violated. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa.Cmwlth. 436, 550 A.2d 1364 (1988).

■ Sewell argues that the WCJ misstated his testimony and the testimony of Dr. Muller. After thoroughly reviewing the record, the Court can find no support for the WCJ's determination that Sewell contradicted his October 1995 testimony before the WCJ during his deposition.

Rather, the record reflects that Sewell related virtually identical accounts on both occasions. At the hearing and at his deposition, Sewell testified that the pain in his hip and groin had been gradually developing prior to November 1994 and that he experienced sudden pain on November 9 while moving equipment. *Compare* N.T. October 18, 1995 at pp. 19, 24–25 *with* Deposition of Sewell at pp. 7–9. Sewell's attribution of his pain to a recurrence of his 1991 injury and his refusal to characterize the 1994 incident as a new injury or as an accident does not create a conflict in his testimony.

The WCJ appears to have likewise misread the testimony of Dr. Muller. The WCJ determined that "Dr. Muller emphasized that the degenerative changes documented on the x-rays were not attributable to a work injury." WCJ's decision, Finding of Fact No. 13, at p. 5. However, as the testimony quoted above demonstrates, Dr. Muller opined that Sewell's work-related traumas aggravated Sewell's degenerative arthritis and set it in motion. No reasonable mind could rely upon this testimony to conclude that Sewell's degenerative changes were not attributable to his work injury. Accordingly, the WCJ's findings regarding Dr. Muller's testimony are not supported by substantial evidence. *Ryan v. Workmen's Compensation Appeal Board (Community Health Services)*, 550 Pa. 550, 707 A.2d 1130 (1998) (providing the definition of substantial evidence).

■ The Court is not persuaded by the Board's reasoning that the WCJ's decision should nevertheless be upheld despite Dr. Mueller's credible testimony that Sewell's work injuries caused his degenerative disease to accelerate because Dr. Mueller relied upon the history provided by Sewell. A personal history given by a claimant may provide a sufficient foundation upon which to premise a competent

expert medical opinion. *Whiteside v. Workmen's Compensation Appeal Board (Unisys Corp.)*, 168 Pa.Cmwlth. 488, 650 A.2d 1202 (1994). Expert medical testimony is not rendered incompetent merely because it is premised upon the expert's assumption of the truthfulness of information provided, unless that information is not proven by competent evidence or is rejected by the WCJ. *Somerset Welding and Steel v. Workmen's Compensation Appeal Board (Lee)*, 168 Pa.Cmwlth. 78, 650 A.2d 114 (1994).

The histories upon which Dr. Muller relied regarding the 1988 and 1991 incidents were undisputed in the record, and the WCJ made no findings to the contrary. The WCJ did not find that Sewell related a false history to Dr. Muller; the WCJ determined only that Sewell's testimony did not credibly establish that he sustained a disabling work injury in November 1994. Because the testimony which the WCJ credited does not support the WCJ's decision but rather supports only an award of benefits to Sewell, the Board's order is reversed with regard to Sewell's claim petition, and this case is remanded for an appropriate award of benefits. The Board's order is affirmed with regard to the penalty petition.

### ORDER

AND NOW, this 26th day of January, 2001, the order of the Workers' Compensation Appeal Board is reversed as to the denial of the claim petition, and the case is remanded in accordance with the foregoing opinion. The Board's order is affirmed with regard to the denial of the penalty petition.

Jurisdiction is relinquished.

KELLEY, Judge, dissenting.

I respectfully dissent.

It is well settled that in a workers' compensation proceeding, the WCJ is the ultimate finder of fact. *Hayden v. Workmen's Compensation Appeal Board (Wheeling Pittsburgh Steel Corp.)*, 83 Pa. Cmwlth. 451, 479 A.2d 631 (1984). Thus, determinations as to witness credibility and evidentiary weight are within the exclusive province of the WCJ and are not subject to appellate review. *Id.* As the finder of fact, the WCJ is entitled to accept or reject even uncontradicted medical testimony in workers' compensation case. *Sherrill v. Workmen's Compensation Appeal Board (School District of Philadelphia)*, 154 Pa.Cmwlth. 492, 624 A.2d 240 (1993). *See also Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 753 A.2d 293 (Pa.Cmwlth.), *petition for allowance of appeal granted*, 563 Pa. 552, 763 A.2d 369 (2000) (It is patently beyond Commonwealth Court's statutory scope of review to reject WCJ's credibility determinations on appeal and to make new findings of fact based on evidence in the certified record; rather, this Court's review of the factual findings is limited to determining whether they are supported by substantial evidence.).

In reversing the Board's order in this case, the majority reviews the credibility determinations made by the WCJ. Such an examination is patently beyond this Court's scope of review. Accordingly, I must respectfully dissent.