**Pamela MURPHY, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (ACE CHECK CASHING INC.), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2014.
Decided Feb. 20, 2015.

John F.X. Fenerty, Jr., Huntingdon Valley, for petitioner.

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

Linda Bobrin, Bensalem, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, BERNARD L. McGINLEY, Judge, BONNIE BRIGANCE LEADBETTER, Judge, RENÉE COHN JUBELIRER, Judge, P. KEVIN BROBSON, Judge, PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge COHN JUBELIRER.

Pamela Murphy (Claimant) petitions for review of the Order of the Workers' Compensation Appeal Board (Board) affirming the Decision of a Workers' Compensation Judge (WCJ) that denied her claim and penalty petitions. On appeal, Claimant argues she is entitled to workers' compensation (WC) benefits under the Workers' Compensation Act[1] (Act) because she met her burden of proving that the mental injury[2] she sustained during an armed robbery at one of Ace Check Cashing Inc.'s (Employer) stores is a compensable, work-related injury, and the Board erred in concluding otherwise.

## I. Background

### a. Facts

Claimant began working for Employer in February 1998, and was most recently employed as Employer's general manager. (WCJ Decision, Findings of Fact (FOF) ¶ 4.) In this position, Claimant was responsible for hiring, firing, and scheduling employees; handling alarm calls; and managing the money for Employer's eight stores. (FOF ¶ 4.) In July 2010, Claimant filed a claim petition alleging she sustained work-related "injuries to her neck, shoulders,

2. Our precedent refers to such injuries interchangeably as mental injuries, psychic injuries, psychological injuries, and psychiatric injuries.

thoracic spine, wrists, and ankles," as well as "post[-]traumatic stress disorder [(PTSD)], anxiety[,] and depression when she was physically and psychologically assaulted during an armed robbery" of Employer's main office on June 19, 2010. (WCJ Decision at 1; FOF ¶1.) Claimant also filed a penalty petition averring Employer violated the Act by issuing a notice of compensation denial denying Claimant WC benefits without any basis in fact or law. (FOF ¶3.) Employer filed timely answers denying Claimant's allegations. (FOF ¶2.) The petitions were assigned to a WCJ, who held hearings.

Claimant testified before the WCJ and described the June 19, 2010 armed robbery.[3] On that day, Claimant and her husband (Husband) arrived at Employer's main office and check cashing store at around 8:10 a.m. Claimant parked next to the dumpster, which was her normal parking spot. When Husband opened the passenger-side door, a man (Gunman) was there with a gun pointed at Husband's face. Gunman "had jumped out of the dumpster" and told them "this doesn't have to be a murder but it will be if they don't do what he tells them." (FOF ¶4.) Gunman directed Husband to turn around, handcuffed Husband with his hands behind his back, pushed Husband into the backseat of the car, and tied Husband's legs together. Claimant screamed at Gunman not to hurt Husband. Taking Claimant's keys from where they had fallen in the car, Gunman told Claimant he wanted the alarms to Employer's office. While pointing the gun at Claimant, Gunman and Claimant walked to the office's door, Claimant opened the door, and turned off the alarm with her code. After telling Claimant there was a second man waiting

in the dumpster who would kill Husband, Gunman told Claimant to take him to Employer's vault. Gunman forced Claimant to go room to room and safe to safe, unlocking doors and turning off various alarms throughout the office as they went. Claimant could not activate her panic button and was not within reach of a silent alarm. Gunman then took Claimant upstairs, where he "threw Claimant on the ground[,] told her to roll over," and hogtied her. (FOF ¶4.) Throughout the robbery, Gunman held her very tightly with the gun to her back and would squeeze her tightly as they moved through the office to ensure Claimant would not get away.

Several minutes after Gunman left, Claimant managed to free a hand and reach her cell phone in her pocket. She called 911 and screamed that she had been robbed and did not know if Husband had been killed. The operator told Claimant the police were at the front of the store and for her to let the police in; Claimant advised the operator she was tied up and could not get out. Claimant then began crawling and ultimately stood up, all while on the phone with the operator. With the rope still around her, Claimant tried to run but was stopped by police officers with guns pointed at her. Although Claimant tried to run to Husband, the police would not let her; Claimant became hysterical, believing Husband was dead. Finally, Husband got out of the car, and the police let Claimant and Husband reunite. Claimant then called Jaci Peluso, Employer's president, and informed her of the robbery. Claimant began experiencing chest pains, could not breathe or speak, and was taken to the hospital by ambulance for treatment.[4] Claimant submitted into evidence the surveillance video taken during

---

3. Claimant's testimony is set forth in FOF ¶4.

4. The WCJ noted for the record that Claimant was shaking throughout her testimony. (Hr'g Tr., August 12, 2010, at 29, R.R. at 35a.)

the robbery and photographs of her wrists and ankles that were taken by her daughter at the hospital. (FOF ¶¶ 4, 8.)

Claimant sought treatment from her family physician, Geoffrey Temple, D.O., on June 21, 2010, complaining of pain in her upper back, shoulders, and neck. During her testimony, Claimant stated that most of her physical injuries had been resolved, but she continued to have pain in her back and side for which she received physical therapy. Claimant believed her back injuries were caused by being hogtied, which aggravated her pre-existing low back arthritis. Claimant testified that she is unable to return to work because of back pain. At Dr. Temple's recommendation, Claimant began seeing Sherri Landes, Ph.D., and had scheduled an appointment with a psychiatrist in order to obtain medication. Claimant stated that, almost two months after the assault, she still has nightmares, experiences panic attacks three or four times per week, has difficulty concentrating, cries for no reason every day, and sometimes does not get dressed or bathe. Claimant testified she is too afraid to return to Employer's office and worries that Gunman will find her in her home. (FOF ¶ 4; Hr'g Tr., August 12, 2010, at 38, 40, R.R. at 44a, 46a.)

Husband confirmed Claimant's description of what occurred in Employer's parking lot during the June 19, 2010 armed robbery. (FOF ¶ 5.) He described the changes in Claimant's mental state, indicating that she breaks down all the time, has panic attacks, and characterized her as "completely wrecked." (FOF ¶ 5; Hr'g Tr. at 65–66, R.R. at 71a–72a.)

Claimant presented the deposition testimony of Dr. Temple. Based on his examinations of Claimant before and after the June 19, 2010 armed robbery, an EMG dated November 2010, and a comparison of MRIs dated December 2007 and August 2010, Dr. Temple diagnosed Claimant with "a L5–S1 annular tear, L5–S1 bilateral radiculopathy," an "aggravation of pre-existing lumbar degenerative disease," reactive lumbar myositis, reactive thoracic myositis, and PTSD. (FOF ¶ 7; Temple Dep. at 26, 29, R.R. at 214a, 217a.) Dr. Temple opined that all of these conditions were caused by the June 19, 2010 armed robbery. (FOF ¶ 7.)

Claimant also produced the deposition of Dr. Landes, Claimant's psychologist. Dr. Landes testified she first saw Claimant on June 23, 2010, four days after the armed robbery. (FOF ¶ 6.) Dr. Landes described Claimant as "shaking and very distressed" when she described the events of June 19, 2010. (Landes Dep. at 10, R.R. at 138a.) She noted that Claimant's son-in-law, who had worked as a courier for Employer, was murdered six years earlier during a robbery at work and that the murderer had recently been convicted. (FOF ¶ 6; Landes Dep. at 12, R.R. at 140a.) According to Dr. Landes, Claimant had difficulty eating; lost weight, felt helpless and out of control, was extremely anxious, and was suffering from severe panic attacks and disrupted sleep patterns. (FOF ¶ 6.) Dr. Landes diagnosed Claimant with PTSD as a direct result of the June 19, 2010 armed robbery of Employer's office, for which she sees Claimant on a weekly basis. (FOF ¶ 6.) Dr. Landes opined that Claimant was not able to return to work and that, while Claimant had improved, she was still afraid to go out and her symptoms were still very severe. (FOF ¶ 6; Landes Dep. at 31, 35, R.R. at 159a, 163a.)

Employer submitted the deposition testimony of Leonard A. Brody, M.D., who examined Claimant on September 15, 2010 and reviewed the 2010 EMG and the 2007 and 2010 MRIs. (FOF ¶ 12.) Dr. Brody testified that Claimant's examination was normal and the test results were consis-

tent with an expected progression of advanced degenerative disc disease. (FOF ¶ 12.) Explaining that he had not seen Claimant until September, Dr. Brody would not opine that Claimant suffered no physical injury in the June 19, 2010 armed robbery, but he indicated he would not attribute Claimant's ongoing physical complaints to that event. (Brody Dep. at 40, R.R. at 445a.)

■ Although Employer contested Claimant's physical injuries, Employer did not present evidence disputing that Claimant had suffered a psychological injury as a result of the June 19, 2010 armed robbery. Instead, Employer offered testimony from various witnesses relating to Employer's security measures and procedures, Claimant's training in that regard, and Employer's suspicions that Claimant committed the robbery that caused her injuries.[5] (Hr'g Tr., January 6, 2011, at 6–147.)

Ms. Peluso, testified, *inter alia*, that: Employer provided security training for its employees, including Claimant; in the event of a robbery or hold up, employees were provided a personal panic button and ambush code; and there was a decoy safe in each of Employer's locations to be used in the event of a robbery, of which Claimant knew. (FOF ¶ 10.) Ms. Peluso stated she was aware of three or four robberies that had occurred over the past seventeen years in which employees were suspected of being involved. (FOF ¶ 10.) Ms. Peluso acknowledged that Claimant had been advised that she should give up the money rather than risk her life during a robbery. (Hr'g Tr. at 47.)

Edwin Torres, the president of the company that had installed Employer's security system, stated that: every employee had a code with which to open and close a store; employees, including Claimant, were trained on how to use the silent alarm; and each of Employer's stores had a unique panic code. (FOF ¶ 11.) However, Mr. Torres agreed that when he tested Claimant's key fob (panic button) after the robbery, it did not work. (FOF ¶ 11.)

Employer's IT manager, Carolyn Lohkemper, indicated she had prepared the video of the location where the robbery took place. (FOF ¶ 9.) Ms. Lohkemper also described the locations of the various video cameras in Employer's main office. (FOF ¶ 9.) Ms. Lohkemper authenticated the video submitted into evidence by Claimant and testified that it shows a large African–American male wearing a black security shirt, carrying a gun, and forcing Claimant through the lobby of Employer's main office. (Hr'g Tr. at 22.)

### b. The WCJ's Decision

The WCJ accepted Claimant's testimony as credible to establish "that the incident at work caused her anxiety and fearfulness that led to [PTSD]." (FOF ¶ 15.) The WCJ found it significant that, "in addition to being confronted by an assailant with a gun during the robbery, Claimant's son-in-law was murdered during a robbery while employed by ... [Employer] and Claimant's [H]usband was at risk for injury during her incident." (FOF ¶ 15.) The WCJ, however, did not accept Claimant's testimony "as to the extent of her physical injuries," noting the photographs of her wrists and ankles showed only slight bruising. (FOF ¶ 15.) The WCJ specifically

---

5. Pursuant to Section 301(a) of the Act, 77 P.S. § 431, "no compensation shall be paid when the injury ... is caused by the employe's violation of law." The employer bears the burden of proving "a causal connection between the violation of law and the claimant's injuries." *Franks v. Workmen's Compensation Appeal Board (SEPTA)*, 148 Pa.Cmwlth. 25, 613 A.2d 36, 37 (1991).

discredited Claimant's accounts of her physical complaints associated with Gunman sticking a gun in her side and holding her tightly during the entire robbery. (FOF ¶ 15.) The WCJ also rejected Claimant's testimony that she had not been trained to respond to a robbery. (FOF ¶ 15.)

The WCJ credited Husband's testimony that Gunman handcuffed him, placed him in the car tied up, and that he "did not go into the building during the robbery." (FOF ¶ 16.) The WCJ also found credible Dr. Landes's opinions diagnosing Claimant with PTSD and "that Claimant [was] incapable of returning to any type of work." (FOF ¶¶ 6, 19.) The WCJ rejected Dr. Temple's testimony regarding Claimant's alleged physical injuries and that her ongoing disability was the result of both physical and psychological components. (FOF ¶ 20.) The WCJ accepted Dr. Brody's testimony that Claimant's ongoing physical difficulties were not the result of the June 19, 2010 armed robbery. (FOF ¶ 24; Brody Dep. at 40, R.R. at 445a.) Finally, the WCJ also accepted as credible the testimony of Ms. Peluso, Ms. Lohkemper, and Mr. Torres regarding Employer's security system and employee training, but did not credit Mr. Torres's testimony "that every employee received an ambush code." (FOF ¶¶ 21–23.)

Based on these findings of fact and credibility determinations, the WCJ found "that the robbery was not an abnormal working condition for Claimant who was a general manager for [Employer], a check cashing business." (FOF ¶ 25; WCJ Decision, Conclusion of Law (COL) ¶ 2.) For this reason, the WCJ concluded that Claimant could not be compensated for "any mental disability or medical treatment for a physical injury." (FOF ¶ 25; COL ¶ 2.) The WCJ also concluded that Claimant did not prove that Employer violated the Act. (FOF ¶ 26; COL ¶ 3.) Accordingly, the WCJ denied Claimant's claim and penalty petitions. (WCJ Order.)

### c. The Board's Opinion

Claimant appealed to the Board, arguing that the WCJ erred in failing to consider her claim under the physical/mental standard and in finding that the June 19, 2010 armed robbery was not an abnormal working condition. The Board affirmed. The Board held that Claimant's physical injuries, for which she did not seek medical treatment, were insufficient to apply the physical/mental standard to Claimant's mental injuries. (Board Op. at 6–7.) Citing Employer's evidence of prior robberies, that Claimant's son-in-law had been murdered in a robbery, and that Claimant had received training in how to respond to a robbery, the Board agreed with the WCJ that Claimant did not establish that the June 19, 2010 armed robbery was an abnormal working condition. (Board Op. at 4–5.) The Board noted that "an armed robbery was foreseeable or could have been anticipated" and, therefore, it was not abnormal. (Board Op. at 5.) Claimant now petitions this Court for review.[6]

### II. Claimant's Appeal to this Court

On appeal, Claimant renews her arguments that: (1) her claim should be considered under the physical/mental standard, not the mental/mental standard, and she met her burden of proof under that standard; and (2) even if it is considered under the mental/mental standard, the evidence

6. Our "review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated." *Gumm v. Workers' Compensation Appeal Board (Steel)*, 942 A.2d 222, 227 n. 5 (Pa.Cmwlth.2008).

demonstrates that the June 19, 2010 armed robbery was not a normal working condition of Claimant's employment.

### a. Whether the WCJ erred in not reviewing Claimant's mental injury under the physical/mental standard.

Claimant first argues that the compensability of her mental injury should be determined using the physical/mental standard because it was the result of various physical actions that occurred during the June 19, 2010 armed robbery, including being hog-tied and thrown to the ground. Claimant asserts that, pursuant to *Donovan v. Workers' Compensation Appeal Board (Academy Medical Realty)*, 739 A.2d 1156 (Pa.Cmwlth.1999), it is unnecessary for her to prove that her mental injury was caused by a work-related physical disability, only that it was the result of a work-related physical stimulus. However, after reviewing *Donovan* and other cases applying the physical/mental standard, we conclude that this standard does not apply under these circumstances.

▪▪▪ As in all cases where a claimant seeks WC benefits via claim petition, Claimant has the initial "burden of proving all the elements necessary to support an award" of benefits. *B & T Trucking v. Workers' Compensation Appeal Board (Paull)*, 815 A.2d 1167, 1170–71 (Pa. Cmwlth.2003). Where, as here, a claimant asserts a claim under the physical/mental standard,[7] the claimant must establish, in relevant part, that the mental injury resulted from a triggering physical stimulus and arose during the course of employment. *Bartholetti v. Workers' Compensation Appeal Board (School District of*

*Philadelphia)*, 927 A.2d 743, 746 (Pa. Cmwlth.2007). "A claimant need not prove that he or she suffered a physical disability that caused a mental disability for which he or she may receive benefits. Nor must a claimant show that the physical injury continues during the life of the [mental] disability." *Donovan*, 739 A.2d at 1161 (emphasis omitted). However, as discussed below, our precedent has interpreted the term "physical stimulus" as a physical injury that requires medical treatment, even if that physical injury is not disabling under the Law. Additionally, the mental injury must be related to the physical stimulus. *See id.* (stating that the claimant must "show that a physical stimulus resulted in a mental disability") (emphasis omitted); *Gulick v. Workers' Compensation Appeal Board (Pepsi Cola Operating Co.)*, 711 A.2d 585, 588 (Pa.Cmwlth.1998) (providing that a claimant must "demonstrate that the physical stimulus caused the injury").

In *Ryan v. Workmen's Compensation Appeal Board (Community Health Services)*, 550 Pa. 550, 707 A.2d 1130, 1131 (1998), the claimant was involved in a work-related automobile accident in which she sustained physical injuries that were accepted by her employer. More than a year after the accident the claimant learned that the other driver, who had sustained severe injuries, had filed a lawsuit against her. *Id.* at 1132. Thereafter, the claimant began experiencing, *inter alia*, depression, she stopped working, and she filed a petition for review to expand her accepted work-related injuries from the accident to include a work-related mental disability. *Id.* The WCJ found that the claimant's disabling mental injuries

---

**7.** Mental injuries fall into three categories: (1) mental/physical, "where a psychological stimulus causes a physical injury"; (2) physical/mental, "where a physical stimulus causes a [mental] injury"; and (3) mental/mental, "where a psychological stimulus causes a [mental] injury." *Ryan v. Workmen's Compensation Appeal Board (Community Health Services)*, 550 Pa. 550, 707 A.2d 1130, 1133–34 (1998).

were caused by a work-related physical stimulus, the accident, and, therefore, applied the physical/mental standard to grant the claimant's petition. *Id.* at 1132–33. The employer appealed to the Board, which reversed and held that the WCJ's finding was not supported by substantial evidence because the claimant and her medical expert testified that the claimant's depression began after learning she was being sued, which was a psychological stimulus. *Id.* at 1133. Applying the mental/mental standard, the Board held that the claimant had not met her burden of proving abnormal working conditions and, therefore, she was ineligible for WC benefits for her mental injury. *Id.* This Court reversed, concluding that there was substantial evidence in the record, as a whole, to support the WCJ's application of the physical/mental standard. *Id.*

The employer appealed to our Supreme Court, which granted the appeal "to determine the proper classification for [c]laimant's psychological injury." *Id.* The Supreme Court reviewed the record and concluded the Board was correct that the claimant's mental injury was not caused by a physical stimulus, the accident, but by a psychological stimulus, the lawsuit. *Id.* at 1134–35. The Supreme Court explained

> that, as a matter of law, the facts demonstrate that it was the psychological stimulus of learning that she was being sued as a result of the work-related accident, rather than the *physical stimulus in the form of the injuries* [the c]laimant suffered from the work-related accident, which caused [the c]laimant's psychological injury.

*Id.* at 1135 (emphasis added). Thus, in holding that the physical/mental standard did not apply, the *Ryan* Court pointed to the fact that the claimant's mental injury was not caused by a "physical stimulus in the form of ... injuries" that resulted from the work-related accident. *Id.*

In *Donovan*, the claimant, a janitor whose job duties did not include emptying medical waste, sustained a mental injury after being pricked twice in the hand by improperly disposed hypodermic needles in one of the medical offices he cleaned. *Donovan*, 739 A.2d at 1159. After reporting each of the injuries to his employer, the claimant received medical treatment in the form of blood work and booster shots. *Id.* The claimant became anxious and fearful of working in that particular office, and he experienced panic attacks, nausea, and nightmares, which caused him to seek psychiatric treatment. *Id.* After being fired for poor job performance, the claimant filed a claim petition alleging he was disabled as a result of his mental injuries. *Id.* The WCJ initially held that the claimant had established a compensable mental injury under the physical/mental standard, but the Board vacated and remanded the matter for the WCJ to apply the mental/mental standard. *Id.* at 1158. On remand, the WCJ concluded that the claimant did not meet his burden of proof under the mental/mental standard because he did not "present corroborating evidence that being exposed to hypodermic needles is an abnormal working condition for janitors working in medical office buildings." *Id.* at 1160 (internal quotation marks omitted). The claimant appealed, and the Board affirmed. *Id.*

On appeal to this Court, we reversed, concluding that the WCJ properly applied the physical/mental standard in the first instance. *Id.* at 1162. We explained that the claimant established that his claim fell under the physical/mental standard because "[t]he WCJ accepted as fact ... that [the c]laimant had twice *injured* himself on hypodermic needles at work *to the extent that he sought treatment*," including blood

work and booster shots due to the concern regarding the transmission of disease from the used hypodermic needles, and "[c]laimant's psychological illness was based directly *on these physical injuries.*" *Id.* (emphasis added). This Court further stated that the claimant did not have to "show that the *physical injury* continues during the life of the [mental] disability." *Id.* at 1161 (emphasis added).[8]

In *Pittsburgh Board of Education v. Workers' Compensation Appeal Board (Schulz),* 840 A.2d 1078, 1079, 1081 (Pa. Cmwlth.2004), the claimant was hit on the head with a heavy object while performing his teaching duties, causing his head to swell; he sought treatment at a hospital; and developed a mental injury as a result. The WCJ awarded benefits under the physical/mental standard, and the Board affirmed. *Id.* at 1079–80. On appeal to this Court, the employer argued, citing *Cantarella v. Department of Corrections/SCI at Waymart,* 835 A.2d 870 (Pa. Cmwlth.2003),[9] that the physical/mental standard was not applicable because the triggering physical event was de minimis and the claimant was not injured. *Schulz,* 840 A.2d at 1081. We rejected that argument, noting that unlike the physical stimulus in *Cantarella,* which "did not result in a **physical** *injury,*" the claimant in *Schulz* had been hit on the head, his head swelled, and he sought treatment for that injury at the hospital. *Id.* (italicized emphasis added). Thus, we concluded that the physi-

cal/mental standard was properly applied under these circumstances. *Id.*

In contrast to *Donovan* and *Schulz,* this Court held that the physical stimulus in *Anderson v. Workers' Compensation Appeal Board (Washington Greene Alternative),* 862 A.2d 678, 685 (Pa.Cmwlth.2004), was insufficient to support the application of the physical/mental standard. In that case, the claimant worked in a group home for mentally and physically handicapped young adults and filed a claim petition alleging that she sustained a work-related mental injury as a result of, *inter alia,* a client "pulling at [her] hair and pulling at [her] blouse." *Id.* at 680–81 (internal quotation marks omitted). The WCJ initially applied the physical/mental standard, but the Board vacated and remanded for the application of the mental/mental standard. *Id.* at 682. On remand, a new WCJ concluded that the claimant's working conditions were abnormal and awarded benefits, but the Board reversed. *Id.* at 682–83. On appeal to this Court, the claimant argued that the physical/mental standard should have been utilized under these circumstances. *Id.* at 683. However, after reviewing *Donovan, Schulz,* and *Cantarella,* we held that "although there was some physical contact between [the c]laimant and her clients during the incidents ...,* she did not suffer any *physical injury that required medical treatment.*" *Id.* at 683–85 (emphasis added). Accordingly, this Court concluded that the matter was "more properly analyzed under the men-

---

8. Our Court also noted in *Donovan* that the claimant would have been eligible for benefits under the mental/mental standard because there was no doubt that the events described actually occurred and because the improper disposal of medical waste was a violation of state safety laws that could not possibly be considered a normal working condition. *Donovan,* 739 A.2d at 1162–64.

9. In *Cantarella,* the claimant, a prison food service instructor, sought benefits under Section 1 of the Act of December 8, 1959, P.L. 1718, *as amended,* 61 P.S. § 951 (Act 632), repealed in part not here relevant by Section 9(b)(2) of the Act of October 4, 1978, P.L. 909, claiming she sustained compensable mental injuries after an inmate who worked under her supervision rubbed her buttocks. *Cantarella,* 835 A.2d at 872. We affirmed the denial of Act 632 benefits. *Id.* at 875.

tal/mental standard" and that the claimant did not meet her burden of proof under that standard. *Id.* at 685–86.

Finally, in *Bartholetti,* we held that the claimant's claim petition for benefits based on a mental injury should be determined by using the physical/mental standard. *Bartholetti,* 927 A.2d at 746–47. The claimant in *Bartholetti,* an elementary school teacher, intervened in an altercation between two students, was punched in the shoulder, and bitten on the arm. *Id.* at 744. The claimant immediately went to the hospital for treatment, including blood tests to determine whether she had contracted HIV or hepatitis. *Id.* The claimant attempted to return to work the next day, but was unable to work more than half a day, and she sought psychological treatment. *Id.* at 744. In addition to crying spells, anxiety, and depression, the claimant experienced "flashbacks of the student fight she intervened in and in which a student bit her on the arm" and was "frightened to return to her school to work." *Id.* at 744–45. The WCJ granted the claim petition, but the Board reversed. *Id.* at 745–46. On appeal, this Court reinstated the WCJ's award because the credited evidence supported the WCJ's finding that the claimant suffered a disabling mental injury "as a result of the *physical injury* she suffered at work" and that "her disability was caused by a work injury." *Id.* at 747 (emphasis added).

■ Claimant argues that the relevant physical stimulus in this matter is all of the physical contact that occurred during the June 19, 2010 armed robbery, including her being hog-tied and thrown to the ground by Gunman. However, in *Ryan,* our Supreme Court linked the term physical stimulus to the physical injuries that had been sustained in the work-related incident. *Ryan,* 707 A.2d at 1135. Moreover, in *Donovan, Schulz, Anderson,* and *Bartholetti,* the award of WC benefits for a mental injury based on the physical/mental standard was predicated on whether the claimants sustained physical injuries during the work incidents for which treatment was required and from which the mental injuries arose. Although these physical injuries, themselves, are not required to be disabling under the Act, *Donovan,* 739 A.2d at 1161, their presence or lack thereof, and their relationship to the mental injury is determinative to whether the physical/mental standard applies. If the term physical stimulus did not require a claimant to suffer a physical injury requiring medical treatment, as Claimant asserts, it would have been unnecessary in *Donovan, Schulz, Anderson,* and *Bartholetti* to discuss the existence, or nonexistence, of such injuries. Rather, all that would have been required was for the claimants to demonstrate that some sort of physical contact occurred to them while at work and that a disabling mental injury resulted. However, none of these cases applied that analysis and, in fact, this Court, in *Anderson,* essentially rejected the argument that physical contact, alone, is sufficient to implicate the physical/mental standard. *Anderson,* 862 A.2d at 685. Accordingly, Claimant's broad reading of the term physical stimulus, which does not require a physical injury that requires medical treatment, is inconsistent with our precedent.[10]

10. To the extent that this Court's panel decision in *New Enterprise Stone & Lime Co., Inc. v. Workers' Compensation Appeal Board (Kalmanowicz),* 59 A.3d 670, 676 (Pa.Cmwlth. 2012), holds that an event itself, such as an automobile accident, is a sufficient physical stimulus, this Court did not fully analyze or address the issue of whether a physical injury requiring medical treatment was necessary to apply the physical/mental standard. Furthermore, the claimant in *Kalmanowicz,* who was involved in an automobile accident whereby

Claimant further asserts that it is undisputed that she suffered a physical injury, bruising to her wrists and ankles from being hog-tied, and, therefore, the physical/mental standard is applicable here. However, based on his review of pictures of that bruising and Dr. Temple's testimony on cross-examination that those bruises were gone two days after the June 19, 2010 armed robbery, the WCJ characterized Claimant's bruising as slight. (FOF ¶¶ 7, 15.) The WCJ further rejected Claimant's assertions that she sustained any other physical injuries as a result of the armed robbery. (FOF ¶ 15.) Notably, Claimant testified that she went to the hospital for treatment because she "started getting chest pains and couldn't breathe or speak" and because "[s]he ha[d] high blood pressure," and Claimant denied that she received any treatment at the hospital other than oxygen and medication to calm her down. (FOF ¶ 4; Hr'g Tr., August 12, 2010, at 26, 28–29, R.R. at 32a, 34a–35a.) Further, the treatment Claimant received thereafter was related either to her PTSD, which the WCJ agreed was caused by the June 19, 2010 armed robbery, or to alleged

neck, shoulder, and back injuries, which the WCJ found were not work related. (FOF ¶¶ 15, 20; Hr'g Tr. at 33–35, 44–45, R.R. at 39a–41a, 50a–51a.) We conclude that slight bruising that requires no medical treatment is not the type of physical injury contemplated by *Ryan*, *Donovan*, *Schulz*, and *Bartholetti* and is more akin to the allegations that were found to be insufficient in *Anderson*. Moreover, Claimant's PTSD was not the result of her physical injury, the slight bruising to her wrists and ankles, but to the entire experience of the June 19, 2010 armed robbery. For these reasons, we hold that the physical/mental standard is inapplicable here and that the compensability of Claimant's mental injury should be determined by using the mental/mental standard.

b. *Whether the WCJ erred in concluding that the June 19, 2010 armed robbery was not an abnormal working condition.*

Claimant next asserts the WCJ erred in concluding that the June 19, 2010 armed robbery was not an abnormal working condition.[11] Claimant argues that the WCJ did not consider the particular facts in this

the driver of another vehicle appeared to commit suicide by running into the claimant's tractor trailer and forcing the claimant down an embankment, did receive medical treatment in the emergency room for "left-sided chest wall and right wrist contusions and left shoulder tenderness/discomfort" following the accident. *Id.* at 672–73. Finally, we note that *Kalmanowicz* was decided before our Supreme Court issued its recent decision in *Payes v. Workers' Compensation Appeal Board (PA State. Police)*, 621 Pa. 564, 79 A.3d 543, 552, 556 (2013) (*Payes II*), in which our Supreme Court analyzed an event very similar to the one at issue in *Kalmanowicz* under the mental/mental standard and concluded that it did not constitute an abnormal working condition. It appears that *Kalmanowicz* may have been more properly analyzed under the mental/mental standard, as the Supreme Court did in *Payes II*, than the physical/mental standard.

11. Claimant initially asserted that Employer's evidence of three or four prior robberies is far less than that presented by the employer in *PA Liquor Control Board v. Workers' Compensation Appeal Board (Kochanowicz)*, 29 A.3d 105, 110–11 (Pa.Cmwlth.2011) (*Kochanowicz I*), in which we held, *inter alia*, that the employer's evidence showed that robberies were a normal working condition because they occurred with enough frequency that they could be anticipated. However, our Supreme Court vacated this Court's Order in *Kochanowicz I* and remanded the matter back to this Court:

for reconsideration in light of *Payes [II,]* 79 A.3d [at] 552 ... (holding that, because [mental] injury cases are highly fact-sensitive, a reviewing court must give deference to the factfinding functions of the WCJ and limit review to determining whether the WCJ's findings of fact are supported by the evidence).

matter, but relied on Claimant's occupation as a general manager of a check cashing business to conclude that the June 19, 2010 armed robbery was not an abnormal working condition. Claimant contends this is contrary to the standard stated in our Supreme Court's recent decision in *Payes v. Workers' Compensation Appeal Board (PA State. Police)*, 621 Pa. 564, 79 A.3d 543 (2013) (*Payes II* ).

■ In *Payes II*, which was decided after the WCJ and the Board issued the

underlying decisions in this matter, our Supreme Court clarified the abnormal working conditions standard.[12] Our Supreme Court held, in relevant part, that because the question of whether working conditions are normal is a mixed question of law and fact, " 'the answer must be evaluated on a case-by-case basis because certain mixed questions are more heavily weighted toward fact, while others are more heavily weighted toward law. The more fact intensive the inquiry, the more

---

*Kochanowicz v. Workers' Compensation Appeal Board (PA Liquor Control Board)*, [— Pa. ——] 85 A.3d 480 (Pa.2014) (Per Curiam Order) (*Kochanowicz II* ). On remand, we held that the WCJ's findings of fact were supported by substantial evidence and that these findings supported the WCJ's legal conclusion that the armed robbery of the liquor store the claimant managed was not a normal working condition. *PA Liquor Control Board v. Workers' Compensation Appeal Board (Kochanowicz)*, 108 A.3d 922, 931–32 (Pa.Cmwlth.2014) (*Kochanowicz III* ).

12. In *Payes II*, the claimant, a state trooper, filed a claim petition asserting that he sustained PTSD after he struck and killed a pedestrian who had run in front of his patrol car while he was travelling to his barracks to begin his shift. *Payes II*, 79 A.3d at 545. The WCJ in that case found that state troopers "are exposed to vehicle accidents, mayhem, bodily injuries, death, murder, and violent acts in the normal course of their duties." *Id.* at 547 (internal quotation marks omitted). However, the WCJ found that state troopers are not normally exposed to, *inter alia*, "a mentally disturbed individual running in front of a Trooper's vehicle while he is operating the vehicle, for no apparent reason." *Id.* (internal quotation marks omitted). Based on these findings, the WCJ concluded that the events "were not normal for a state trooper but instead were extraordinary and unusual," the claimant's mental injury was the result of an abnormal working condition and, thus, compensable. *Id.* (internal quotation marks omitted).

The employer appealed, and the Board reversed the WCJ's order, holding that "[w]hile being involved in a fatal accident may be traumatic and not routine for a state trooper,

we cannot agree that this incident constitutes an abnormal working condition given the nature of [the claimant's] stressful and perilous profession." *Id.* (internal quotation marks omitted). This Court affirmed the denial of benefits, concluding that the events "may have been unusual, but they were not so much more stressful and abnormal than the already highly stressful nature of [the c]laimant's employment to render an award of benefits appropriate." *Payes v. Workers' Compensation Appeal Board (Commonwealth of PA/ State Police)*, 5 A.3d 855, 862 (Pa.Cmwlth. 2010), *rev'd, Payes II* (*Payes I* ). This Court further stated that troopers "can be expected to be witness to horrible tragedy." *Payes I*, 5 A.3d at 861. We evaluated the constituent parts of the event, noting that state troopers respond to motor vehicle accidents, during that response the trooper may be subjected to traumatic visuals such as injuries and death, and a trooper may be required to take someone's life. *Id.* We concluded that, "[b]ut for the part that [the c]laimant was the one who struck the woman with his vehicle, there would be no question that any resulting psychological injury would not be compensable" and "[t]his fact ... does not take [the c]laimant's mental injuries that would ordinarily be noncompensable and render an award of benefits appropriate." *Id.* at 862.

The claimant appealed to the Supreme Court, which reversed and concluded that the WCJ's findings of fact were supported by substantial evidence and those findings supported the WCJ's legal conclusion that the claimant's PTSD was caused by "a singular, extraordinary event occurring during [the claimant's] work shift," and not a normal working condition. *Payes II*, 79 A.3d at 553, 556.

deference a reviewing court should give to the [WCJ's] findings below.'" *Payes II,* 79 A.3d at 549 n. 3 (quoting *Gentex Corporation v. Workers' Compensation Appeal Board (Morack),* 611 Pa. 38, 23 A.3d 528, 534 n. 10 (2011) (emphases omitted)). "Although the ultimate determination of whether [the claimant] has established 'abnormal working conditions' is a question of law" subject to appellate review, "'[mental] injury cases are highly fact-sensitive[,] and for actual working conditions to be considered abnormal, they must be considered in the context of specific employment.'" *Id.* at 552 (emphasis omitted) (third alteration in original) (quoting *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America),* 542 Pa. 614, 669 A.2d 338, 343 (1996)).

The Supreme Court further explained that, when considering whether a working condition is normal, no "'bright line test or ... generalized standard'" should be employed. *Id.* (quoting *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton),* 590 Pa. 413, 912 A.2d 1278, 1288 (2007)). It "emphasize[d] that [mental] injury [WC] cases are 'highly fact-sensitive'" and

> [a]lthough we have articulated [these] principle[s] in conjunction with the claimant's particular occupation, ... *this does not mean that the abnormal[ ]working[ ]conditions analysis ends when it is established that the claimant generically belongs to a profession that involves certain levels or types of stress. Otherwise, the court's analysis would not rest upon the unique factual findings of the case* but rather on what a court or tribunal, in its subjective wisdom, determines is the quantity or quality of stress an employee should be able "to take," or what episode of stress is, in the tribunal's subjective determination, comparable to a different episode

of stress, which may be expected to be tolerated by an employee.

*Payes II,* 79 A.3d at 555 (quoting *Wilson,* 669 A.2d at 343) (emphasis added).

Here, the WCJ credited most of Claimant's account of what occurred during the June 19, 2010 armed robbery. (FOF ¶ 15.) The WCJ further credited Claimant's testimony that the June 19, 2010 armed robbery "caused her anxiety and fearfulness that led to [PTSD]," and Dr. Landes's opinion indicating the same. (FOF ¶¶ 6, 15, 19.) The WCJ focused on Claimant's employment and concluded "that the robbery was not an abnormal working condition for Claimant who was a general manager for [Employer], a check cashing business." (FOF ¶ 25.) However, the WCJ did not have the benefit of the Supreme Court's analysis in *Payes II* and, therefore, did not examine the actual events of the June 19, 2010 armed robbery to determine whether they represented "a singular, extraordinary event occurring during [Claimant's] work shift" that caused Claimant's PTSD, *Payes II,* 79 A.3d at 553. *See also PA Liquor Control Board v. Workers' Compensation Appeal Board (Kochanowicz),* 108 A.3d 922, 928–32 (Pa. Cmwlth.2014) (*Kochanowicz III* ) (applying *Payes II* to hold that, notwithstanding the employer's evidence that its stores had been robbed in the past and that the claimant had received some training on safely reacting to robberies, the WCJ, and this Court, had to review the particular robbery and determine whether that robbery was not a normal working condition). We will, therefore, vacate the Board's Order affirming the WCJ's Order and remand this matter for the WCJ to apply the analysis in *Payes II* to determine whether the June 19, 2010 armed robbery was an abnormal working condition.

Accordingly, the Board's Order affirming the WCJ's Order is vacated and this

matter is remanded to the Board for further remand to the WCJ to consider whether Claimant established, under *Payes II* and *Kochanowicz III*, that the June 19, 2010 armed robbery that caused her PTSD was an abnormal working condition.

## ORDER

**NOW,** February 20, 2015, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is hereby **VACATED** and this matter is **REMANDED** for proceedings in accordance with the foregoing opinion.

Jurisdiction relinquished.

## CONCURRING OPINION BY Judge LEADBETTER.

I agree with the majority's analysis of the physical/mental issue, which is well supported by controlling precedent. Moreover, I believe that the distinction between physical/mental and mental/mental injuries would be unmanageably blurred if a "physical stimulus" which caused little or no physical injury, and did not cause the mental injury but only occurred incidental to a traumatic event, would transform a mental/mental claim into a physical/mental claim. In addition, it would be manifestly unfair if a claimant who suffered a mental injury in such an event could utilize the far less exacting physical/mental burden of proof, while another claimant who suffers the same mental injury during the same traumatic event, but without any physical impact, would have to meet the far more exacting mental/mental burden of proof.

With respect to the mental/mental claim at issue here, again I agree that the majority has accurately described and properly applied controlling precedent. Were we to be writing on a clean slate, however, I would hold simply, as a matter of law, that regardless of the frequency of violence experienced in the claimant's workplace, or by the claimant herself, having one's spouse held hostage at gunpoint and threatened with murder cannot be considered "normal." It is ironic that this experience was particularly chilling for Ms. Murphy because her son-in-law was, in fact, murdered in a robbery while working for the same employer, yet under the controlling analytical paradigm for mental/mental claims the existence of this prior event militates in favor of finding that violent robberies were not abnormal in this workplace, and thus that her mental trauma was non-compensable.

Accordingly, I would urge our Supreme Court to revisit this standard, and I must respectfully concur only in the result reached by the majority.

President Judge PELLEGRINI joins.

## CONCURRING OPINION by Judge McCULLOUGH.

I agree with the result reached by the Majority as well as its thoughtful analysis. I write separately to emphasize that, as recognized by the Majority, in *Payes v. Workers' Compensation Appeal Board (Commonwealth PA State Police),* 621 Pa. 564, 79 A.3d 543 (2013) our Supreme Court clarified the abnormal working conditions standard. Because cases involving mental injuries are highly fact-sensitive, there is no bright line test or standard that is *generally* applicable, and the court's findings must be based on the unique findings of the case, as found by the workers' compensation judge. At one time, the fact that Pamela Murphy's son-in-law was murdered while working for the same employer would militate a determination that the specific violent episode experienced by this claimant was not an abnormal working condition. Following the Supreme Court's

decision in *Payes,* however, such presumptions no longer apply.