# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steve Russo,                 :
           Petitioner          :
                        :
           v.                  :     No. 1093 C.D. 2024
                        :
Upper Darby Township (Workers'     :
Compensation Appeal Board),       :
           Respondent    :     Submitted: June 3, 2025


BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE MATTHEW S. WOLF, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION BY
JUDGE WOLF                            FILED:  December 8, 2025


Steve Russo (Claimant) petitions this Court for review of an August 2, 2024 order of the Workers' Compensation Appeal Board (Board), which affirmed a decision by WCJ Kathleen DiLorenzo denying Claimant's petition for workers' compensation benefits (Claim Petition) and his petition to amend the injury description listed on a Notice of Temporary Compensation Payable (NTCP) (Review Petition). Claimant argues that WCJ DiLorenzo misinterpreted controlling authority governing the so-called physical/mental and mental/mental burdens of proof for psychological injuries, and that she reached a conclusion inimical to the humanitarian purposes of the Workers' Compensation Act.[1] Because WCJ DiLorenzo relied on factual determinations without support in the record and consequently reached a decision that was both unreasonable and unjust, we reverse.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

# I. Background

Claimant was a 14-year veteran officer of the Upper Darby Township (Township) Police Department when, on November 20, 2020, he was involved in a violent struggle that concluded with the death of a wanted suspect. *See* Certified Record (C.R.), Item No. 18, Incident Report. The Township issued an NTCP, which converted by operation of law to a medical-only Notice of Compensation Payable (NCP) on February 19, 2021.[2] Therein, the Township listed the work injuries as a strain or tear to one or both shoulders and unspecified injuries to the throat, neck, left hand, and shoulder. C.R., Item No. 19, NTCP. Claimant returned to work on March 1, 2021, but was placed again on administrative leave on December 15, 2021. C.R., Item No. 26, Evaluation Form.

Through the August 9, 2022 Review Petition, Claimant sought to add post-traumatic stress disorder (PTSD), depression, and an injury to the right elbow to the list of accepted work injuries. C.R., Item No. 2. Claimant filed his Claim Petition on the same day seeking wage loss benefits. C.R., Item No. 5. The Township filed timely answers to both petitions, in which it denied that Claimant suffered from a work-related disability and that an amendment of the injury description was warranted. C.R., Item Nos. 4, 7.

In support of his Claim and Review Petitions, Claimant testified at hearings before WCJ DiLorenzo and presented the deposition testimony of Dr. Mark Paiste, an orthopedic surgeon, and of Dr. Lee Solomon, a clinical psychologist. In its defense, the Township presented the hearing testimony of Timothy Bernhardt, its

---

[2] Section 406.1(d)(6) of the Workers' Compensation Act (Act), added by Section 3 of the Act of February 8, 1972, P.L. 25, 77 P.S. § 717.1(d)6), provides that an employer who does not provide notice of a discontinuance of medical payments within 90 days of issuing an NTCP "shall be deemed to have admitted liability and the [NTCP] shall be converted to a[n NCP]."

Superintendent of Police, and the deposition testimony of Dr. Noubar Didizian, an orthopedic surgeon.

## A. Claimant's Testimony

At a September 14, 2022 hearing, Claimant stated that he was 48 years old and a 24-year law enforcement veteran. C.R., Item No. 13, 9/14/2022 Hr'g Tr. at 6-7. Since 2006, Claimant had been working for Employer as a canine patrol officer. *Id.* at 7.

On the morning of November 20, 2020, during roll call, Claimant and fellow Township police officers were instructed to be on the lookout for Jeffrey Laudermilt II, an "armed and dangerous" man who was alleged to have recently "beat[en] up his girlfriend pretty bad" before fleeing from Township police. *Id.* at 12. Mr. Laudermilt was also wanted in several jurisdictions elsewhere in the United States. *Id.* at 12. At approximately 12:30 that afternoon, while patrolling the area near the Cobbs Creek Golf Club, Claimant observed Mr. Laudermilt standing in front of a house. *Id.* at 12-13. Claimant informed him that he was under arrest and admonished him not to run, but Mr. Laudermilt slipped into an alleyway. *Id.* at 12. With Claimant pursuing him on foot, Mr. Laudermilt ran for several blocks until "jump[ing] off a pretty steep embankment . . . covered in vegetation," into which Claimant followed him. *Id.* at 13-14. Claimant caught up with and cornered Mr. Laudermilt in the embankment and shouted again that he was under arrest, but Mr. Laudermilt replied, "I'm not going back to jail. I'm going to fucking kill you." *Id.* at 15. After Claimant made a final plea for cooperation, Mr. Laudermilt charged at him; Claimant deployed his taser, which struck Mr. Laudermilt in the chest, but Mr. Laudermilt pulled the electrodes off of his body and charged again at Claimant. *Id.* Fearing that Mr. Laudermilt could gain control of the taser and use it against him,

Claimant threw it away and opted for hand-to-hand combat. *Id.* When Mr. Laudermilt charged at him again, Claimant grabbed Mr. Laudermilt's legs and shoved him against a tree trunk, but Mr. Laudermilt managed to place Claimant in a headlock; Claimant began choking. *Id.* at 16. Mr. Laudermilt's grip was forceful enough that Claimant could feel that his feet were coming off the ground. *Id.* Claimant heard the sound of fellow officers nearby but knew that they could not see or hear him in the dense vegetation of the embankment. *Id.*

With his head and neck still firmly in Mr. Laudermilt's grip, Claimant reached with his right arm toward his left waist, where his radio handset should have been, but discovered that his entire duty belt had come loose and his holster undone. *Id.* at 17. Claimant noted that his service weapon was protected by a triple retention holster, which is "very hard" to break, yet Mr. Laudermilt had managed to begin prying the service weapon out. *Id.* at 18. Nonetheless, Claimant managed to emerge from Mr. Laudermilt's grasp and place himself atop Mr. Laudermilt's body while they continued to fight for control of the firearm. *Id.* Finally, Claimant placed his right hand on the firearm's grip; Mr. Laudermilt grabbed the muzzle and moved it sideways. *Id.* at 18. Fearing that his own death would be imminent if he did not "stop this threat," Claimant aimed the barrel at Mr. Laudermilt's torso, with Mr. Laudermilt's hand still on the muzzle, and fired a single shot into Mr. Laudermilt's chest. *Id.* at 19. Mr. Laudermilt still tried to fight off Claimant in spite of the bullet wound; meanwhile, the spent casing from the shot Claimant fired did not fully eject, making a second shot impossible. *Id.* at 19. Claimant continued to struggle with the bloodied Mr. Laudermilt until the arrival of Philadelphia police officers who were radioed for assistance. *Id.* at 19, 30. The officers jumped into the embankment and

immediately tased Mr. Laudermilt, which finally weakened him enough that he was taken into custody. *Id.*

With Mr. Laudermilt subdued, Claimant and the Philadelphia officers called for an ambulance and carried Mr. Laudermilt out of the embankment, fearing that it would be inaccessible to paramedics. *Id.* at 30. Sensing that Mr. Laudermilt was dying, Claimant undid his handcuffs and lifted Mr. Laudermilt's shirt. *Id.* Claimant observed a hole in Mr. Laudermilt's chest, from which so much blood was emerging that it was as though "somebody turned a fountain on." *Id.* The stream of blood "almost hit me in the face," Claimant recalled. *Id.* Claimant attempted to perform cardiopulmonary resuscitation (CPR) on Mr. Laudermilt but quickly recognized it to be futile. *Id.* Mr. Laudermilt was taken by patrol vehicle to Lankenau Medical Center, where he was pronounced dead at 1:48 p.m. *Id.*; *see also* Incident Report at 2.

For his own injuries from the incident, Claimant was transported to the emergency room (ER) at Penn Presbyterian Medical Center. *Id.* at 21, 44-45. Notes compiled by ER staff indicate that Claimant had been caught in a chokehold for approximately 30 seconds and presented with neck soreness, shoulder soreness, back pain, wrist pain, and hand pain, and that ER staff released him that afternoon. *See* C.R., Item No. 25, Hospital Records.[3] Consistent with the Township's employment policies, Claimant was also examined by its panel psychologist, Dr. Marla McLaughlin, one week after the incident. 9/14/2022 Hr'g Tr. at 45. Claimant recalled that the primary purpose of the evaluation was to determine whether he was

---

[3] The notes by Penn Presbyterian ER staff were admitted by WCJ DiLorenzo at the request of both parties. *See* WCJ Decision, F.F. No. 8. At Claimant's request, WCJ DiLorenzo also admitted photographs taken on the afternoon of November 20, 2020, showing his broken duty belt as well as scrapes and scratches on both of his hands. *See* C.R., Item Nos. 21-24.

still fit for duty, and that Dr. McLaughlin determined Claimant to be fully fit. *Id.* at 49. Nonetheless, Claimant was placed on administrative leave while the Delaware County District Attorney's Office investigated the November 20, 2020 incident. *Id.* at 35. Claimant continued to see Dr. McLaughlin weekly during his administrative leave. *Id.* at 46.

While on administrative leave, Claimant recalled, he "couldn't wait to get back" to work. *Id.* at 36. When he was finally returned to full duty, on March 1, 2021, the Township promoted him to the rank of sergeant, which placed him in charge of a platoon of officers. *Id.* Nonetheless, Claimant began "running into some issues" involving his mental state during certain work situations. *Id.* The first involved the discovery of a dead body in a car, which left Claimant with a peculiar feeling and the suspicion that his "decision making was off." *Id.* At the time, Claimant attributed the unusual reaction to his long absence from work and reminded himself that, now that he was a supervisor, it was permissible for him to be "kind of a little hands[-]off" in his management of the situation. *Id.*

In April 2021, Claimant and fellow officers responded to a call regarding a homicide suspect who barricaded himself inside a building, necessitating a thorough search of the building. *Id.* at 37. During the search, Claimant saw the suspect's feet behind a curtain and, with his service weapon pulled, instructed him to come out. *Id.* "[T]hankfully," Claimant recalled, the suspect "came out and everything was okay," yet Claimant's hands were "shaking uncontrollably." *Id.* Claimant again reassured himself that he would "get through" whatever was happening to his state of mind. *Id.*

Throughout the summer of 2021, Claimant observed that the changes he was noticing in his mental state got "progressively worse." *Id.* Asked to describe those

changes in detail, Claimant responded that there was often "a feeling that . . . . [his] heart would never beat," accompanied by shortness of breath. *Id.* at 38. Claimant began to encounter difficulty concentrating and a deep aversion toward conflict, which left him doubtful of his ability to protect himself and others in violent situations. *Id.* at 40. In contrast to the enthusiasm that he had formerly shown for his job, Claimant began lying down for a couple of hours before his shift with the goal of taking a nap but would instead "just stare at the ceiling." *Id.* at 41. The knowledge that his shift was about to begin "would drive [Claimant] crazy," he recalled. *Id.*

At home, Claimant recalled, he began to drink "severely" and "to the point where . . . it really affected [his] family." *Id.* at 41. Claimant recounted one morning when he had an argument with his teenaged daughter about homework; after she left for school, Claimant grabbed the television from her bedroom and threw it into his front yard. *Id.* at 42. The strain on the family caused by Claimant's behavioral changes caused his wife to visit a psychiatrist on her own. *Id.* at 41. Claimant testified that he had not previously experienced problems of this magnitude in his marriage or with his alcohol consumption. *Id*. at 42.

Over time, the connection between the changes in Claimant's mental state and the fatal November 20, 2020 incident became obvious. *Id.* at 30-31. Claimant explained that he could not get out of his mind certain images from that day, such as the way in which Mr. Laudermilt's t-shirt "puffed up" when Claimant fired his service weapon or the look on Mr. Laudermilt's face the instant when he was shot. *Id.* at 29. At night, Claimant began having dreams several times a week in which Mr. Laudermilt appears in a blood-drenched t-shirt, looking directly at Claimant. *Id.* at 32. Claimant tended to awaken from these dreams at 1:30 or 2 o'clock in the

morning and feel the need to walk around the house. *Id.* In an effort to get back to sleep, Claimant often went back inside to watch television but tended to be "up for the rest of the night" after the dreams of Mr. Laudermilt. *Id.*

From his March 1, 2021 return to work until October 2021, Claimant continued to see Dr. McLaughlin twice monthly. *Id.* at 46. In October, in response to the worsening of Claimant's symptoms, Dr. McLaughlin referred Claimant to a clinical psychologist who could "better suit[ his] needs," by which she meant a PTSD specialist. *Id.* at 54. Consequently, Claimant began treatment with Dr. Solomon. *Id.* at 55. In December 2021, changes in Claimant's professional performance caused his supervisors to express their concern to Dr. McLaughlin, who took Claimant out of work on December 17, 2021.[4] *Id.* at 46. Claimant then returned to paid administrative leave. *Id.* at 34.

With Claimant once again off work, a friend expressed interest about hiring Claimant part-time at a funeral home the friend owned. *Id.* at 59. Claimant, who was "going kind of stir crazy at home," eagerly accepted the offer. *Id.* at 59-60. After Dr. McLaughlin advised Claimant that she found working part-time to be an "excellent" idea, Claimant began working there in January 2022. *Id.* at 59. Claimant's duties included driving to hospitals, obtaining death certificates, and helping vendors and contractors set up funerals. *Id.* at 60. After feeling considerable

---

[4] In an evaluation form submitted to the Commonwealth's Municipal Police Officers' Education and Training Commission on December 17, 2021, Dr. McLaughlin indicated her "professional opinion that [Claimant] **IS** experiencing symptoms of [PTSD] and is **NOT CLEARED** to perform the full duties of a police officer in Pennsylvania at this time." C.R., Item No. 26 (emphasis in original). In an accompanying letter, Dr. McLaughlin explained the distinction between Acute Stress Disorder (ASD), the symptoms of which are exhibited within a month of a traumatic event, and PTSD, the symptoms of which are characterized by their "persistent and disruptive nature." *Id.* at 2. While Claimant showed no signs of ASD and could therefore function normally in the months following the fatal incident, "his symptoms have increasingly and significantly interfered with his ability to safely execute his job duties." *Id.*

discomfort in that environment, however, Claimant paused working there after 10 or 15 shifts. *Id.* Claimant acknowledged that he failed to notify Township officials of his employment at the funeral home in spite of a policy requiring him to do so because of his administrative pay. C.R., Item No. 14, 11/2/2022 Hr'g Tr. at 30. When Superintendent (Supt.) Bernhardt learned that Claimant was working for the funeral home, he informed Claimant that holding another job while on administrative leave was frowned upon. *Id.* Because of that conversation and the aforementioned difficulties with the work environment, Claimant decided not to resume work at the funeral home. *Id.*

At a November 2, 2022 hearing before WCJ DiLorenzo, Claimant recounted that his full-pay administrative leave ended on September 13, 2022. C.R., Item No. 14, 11/2/2022 Hr'g Tr. at 35. On that date, Claimant received a letter from the Township informing him that he was being placed on sick leave, as his workers' compensation claim had recently been denied. *Id.* Claimant also underwent elbow surgery by Dr. Paiste on October 13, 2022, and a slow recovery from that operation rendered Claimant further doubtful of his ability to return to full-duty work. *Id.* at 40.

### B. Supt. Bernhardt's Testimony

At an April 26, 2023 hearing, Supt. Bernhardt testified that he had served as Superintendent, the Township's top-ranking police official, since 2019. C.R., Item No. 15, 4/26/2023 Hr'g Tr. at 6. Supt. Bernhardt explained that all Township police officers must undergo yearly firearms training, which is based on whatever handgun or rifle the officer is assigned. *Id.* at 8. Officers are also required to undergo use-of-force training, which is designed to assist officers in handling "individuals who don't want to comply" and in de-escalating situations of noncompliance. *Id.* Supt.

9

Bernhardt noted that the canine division undergoes an additional round of training to handle their dog companions, and that Claimant served as a trainer and instructor in that division. *Id.* at 8.

Recounting the events of November 20, 2020, Supt. Bernhardt explained that he first became aware of Mr. Laudermilt's presence in the Township one week before, when he received word that Mr. Laudermilt could be in the area, was wanted on "multiple outstanding warrants," and was "known to be violent." *Id.* at 9. Regarding the violent encounter between Mr. Laudermilt and Claimant, Supt. Bernhardt testified that it was "something that police officers in [the] Township are trained to deal with." *Id.* at 10. Supt. Bernhardt characterized the incident as "normal" for Township officers, particularly in recent years, as he believes lethal encounters between officers and suspects have become more common nationwide. *Id.* at 10. On cross-examination, Supt. Bernhardt acknowledged that the death of Mr. Laudermilt was the only occasion since he became Superintendent that a Township officer was forced to take someone's life. *Id.* at 32. At that point in the cross-examination of Supt. Bernhardt, WCJ DiLorenzo interrupted Claimant's counsel to make the following remark:

> [Counsel,] are you going to argue that when a police officer discharges a firearm in pursuit of a suspect, that's an unusual and abnormal working condition? Is that where you're going with this? Because I'm Philadelphia born and raised[,] I've been living out here for quite a while, and to me, that does not seem, in this area, [] to be unusual and abnormal.

*Id.* at 32-33. Claimant's counsel responded that he was not asking about the abnormality of the need to discharge a firearm but of the need to kill a suspect. *Id.* at 33. Counsel then asked Supt. Bernhardt how many times he has discharged a

10

service firearm in his 27 years as an officer; Supt. Bernhardt acknowledged that he never has discharged a service firearm while on duty. *Id.*

## C. Dr. Solomon's Testimony

During a March 1, 2023 telephone deposition, Dr. Solomon testified that he is a licensed clinical psychologist specializing in behavioral medicine. C.R., Item No. 28, Solomon Dep. at 5. Dr. Solomon summarized his understanding of the November 20, 2020 incident as follows:

> [Claimant] came across a suspect wanted on a warrant. He pursued the actor on foot. When he caught up to him[,] he instructed the actor to put his hands up. The actor responded, "I'm going to kill you." . . . [Claimant] tased the actor. A violent struggle with this actor ensued with the suspect attempting to take [Claimant's] service revolver. [Claimant] shot and killed the actor [and] sustained physical injuries to his left shoulder, right elbow and neck.

*Id.* at 9-10. It was Dr. Solomon's understanding that Dr. McLaughlin "deemed [Claimant] fit for duty" immediately following the incident. *Id.* at 11. Dr. Solomon went on to explain that "[Claimant] reported he initially self-medicated at that time with increased alcohol consumption." *Id.* Following a December 17, 2021 reevaluation of Claimant's mental state, Dr. McLaughlin found Claimant no longer "psychologically fit for a return to duty." *Id.* at 11-12. Dr. Solomon recalled that Claimant "initially self-medicated" during the intervening period but "was eventually able to return to his premorbid level of alcohol consumption." *Id.* at 11. In Dr. Solomon's view, Claimant was taken off work because he "presented a symptom complex consistent with a diagnosis of [PTSD] and a depressive disorder." *Id.* at 12.

Following a March 28, 2022 initial evaluation, Dr. Solomon concluded that Claimant exhibited a "symptom complex" similar to the one described in Dr.

11

McLaughlin's evaluation from the previous December. *Id.* Specifically, Dr. Solomon found the following symptoms to be present in Claimant: (1.) feelings of depression; (2.) nightmares; (3.) flashbacks or intrusive memories of the traumatic event; (4.) frequent crying; (5.) significant mood swings; (6.) anxiety; (7.) psychological distress "to cues that symbolize some aspect of the traumatic event"; (8.) avoidance of stimuli that were associated with the traumatic event; (9.) an inability to experience positive emotions with activities that had previous elicited those emotions; (10.) irritability; (11.) decreased libido; (12.) hypervigilance; (13.) an exaggerated startle response; (14.) difficulty with concentration; (15.) sleep dysfunction; and (16.) a sense of impending danger. *Id.* at 19. Dr. Solomon explained that the foregoing symptoms are precisely of the kind recognized in his field as warranting further investigation for a possible PTSD diagnosis. *Id.* at 20.

Accordingly, Dr. Solomon administered a PTSD Checklist 5 (PCL-5) test, which is routinely used to make a more formal determination of whether a patient suffers from PTSD. *Id.* at 20-21. Dr. Solomon explained that any PCL-5 score of 30 or more "is considered clinically significant"; Claimant's score was 41. *Id.* at 21. Following the PCL-5, Dr. Solomon administered a generalized anxiety disorder 7 (GAD-7) test, also customary in his field, which revealed "significant levels of symptoms of anxiety" in Claimant. *Id.* at 23. After the GAD-7 test, Dr. Solomon administered a patient health questionnaire 9 (PHQ-9) test to screen for symptoms of depression; Claimant's score was found "to be clinically significant." *Id.* at 23. Dr. Solomon juxtaposed these findings with the lack of any psychiatric issues in Claimant's medical history before 2020. *Id.* at 21-22. In Dr. Solomon's view, "a consistent picture" was forming of "multiple symptoms" consistent with PTSD. *Id.* at 21. Following his initial findings, Dr. Solomon has engaged in weekly telehealth

sessions with Claimant, which has given Dr. Solomon "the opportunity to see the significance of these symptoms that [he] listed in [his] initial report[ and] how much they intrude . . . in his life in all spheres." *Id.* at 38.

Based on his review of the records and regular sessions with Claimant, Dr. Solomon opined that Claimant continues to endure "symptoms consistent with [PTSD]" and that "the November 20, 2020 violent physical struggle . . . caused the manifestation of the symptoms of PTSD." *Id.* at 36. Dr. Solomon did not believe that the "delayed onset" of symptoms cast doubt on his diagnosis; to the contrary, "the day after a trauma occurs—no matter how severe—it would be . . . unusual to see an individual meet all the criteria for the symptoms required to make that diagnosis." *Id.* at 30-31. It is "more typical," he explained, that the symptoms begin to surface "as the days and the weeks go by." *Id.* at 31. Dr. Solomon also cautioned against the assumption that certain events, such as a violent fatality, will automatically lead to PTSD symptoms, since trauma responses are highly specific to the individual; yet, in Claimant's case, Dr. Solomon does "believe that the outcome of a fatality where [Claimant] had to discharge his service revolver certainly contributed significantly" to Claimant's PTSD symptoms. *Id.* at 36-37. If Claimant continues to experience chronic physical pain as a result of the encounter, Dr. Solomon believed that it may "also contribute to the psychological symptoms that led to the diagnosis of PTSD." *Id.* at 33.

Concerning prognosis, Dr. Solomon expressed the hope that with continued treatment, Claimant's PCL-5 score will "go down over time," but admitted that the score has most recently gone up.[5] *Id*. at 24-25. Because of the persistence of

---

[5] Dr. Solomon was referring to his most recent application of the PCL-5 criteria to evaluate Claimant, which resulted in a score of 59. Solomon Dep. at 25. However, Dr. Solomon cautioned **(Footnote continued on next page…)**

13

Claimant's symptoms at the time of his testimony, Dr. Solomon opined that Claimant "is totally disabled from returning to his prior work." *Id.* at 38. Indeed, while Dr. Solomon was hopeful that "some form of gainful activity . . . could be a consideration in the future," he believed that Claimant was "fully disabled from working in any capacity" at the time of the deposition. *Id.* at 39-40.

### D. Dr. Paiste's Testimony

At a February 14, 2023 deposition, Dr. Paiste testified that he is a board-certified orthopedic surgeon specializing in "surgery of the upper limb from the shoulders to the hands." C.R. Item No. 27, Paiste Dep. at 5-6. Dr. Paiste's understanding of the November 20, 2020 incident was that Claimant was involved in a "violent, prolonged[,] and strenuous physical altercation" during which a suspect "persistently attempted to grab [Claimant's] service revolver," as a result of which Claimant "had no choice but to shoot and kill the suspect in order to save his own life." *Id.* at 12. Since that incident, Claimant has "multiple pain complaints," beginning with the neck pain, left wrist pain, and hand pain for which he was treated at Penn Presbyterian on the afternoon of the incident. *Id.* at 13.

To treat his continued pain symptoms, Claimant met with Dr. Paiste, who performed an initial evaluation on March 9, 2022, and found "ongoing left shoulder pain that was worse with overhead activities, reaching, lifting, and sleeping at night[,] especially on his left side." *Id.* at 13-14. Claimant also exhibited difficulties with lifting and gripping in his right hand, as well as numbness and tingling that was "worse at nighttime." *Id.* at 14. Dr. Paiste noted that Claimant denied having any of these issues before the November 20, 2020 incident. *Id.* Since the initial

---

against the assumption that Claimant's condition is necessarily worsening, since PTSD symptoms "will wax and wane" and are "not going to be at the exact same level each and every week." *Id.* at 24.

evaluation, Dr. Paiste has continued to treat Claimant on more than a dozen occasions, most recently on February 3, 2023. *Id.* at 14-15. Dr. Paiste performed surgery on Claimant's right elbow in October 2022, and administered steroid injections in his left shoulder on April 4, 2022, and October 4, 2022. *Id.* at 16, 23.

Concerning the etiology of Claimant's symptoms, Dr. Paiste opined that they are "post[-]traumatic in nature," particularly given that Claimant "had no prior left shoulder problems before the [November 20, 2020] incident." *Id.* at 36. Dr. Paiste further concluded that the surgery he performed on Claimant's right elbow was necessitated by that incident. *Id.* at 42. Concerning prognosis, Dr. Paiste opined that Claimant "remains symptomatic and still requires ongoing treatment[,] including surgical intervention."[6] At the time of the deposition, Dr. Paiste was convinced that Claimant was unable to return, "and remains disabled from returning[,] to his preinjury job as a police officer." *Id.* at 53.

### E. Dr. Didizian's Testimony

At an April 26, 2023 deposition, Dr. Didizian testified that he is a board-certified orthopedic surgeon whose practice is currently limited to examining orthopedic patients. C.R., Item No. 36, Didizian Dep. at 9. Dr. Didizian performed an independent medical examination (IME) of Claimant on September 7, 2022, which began with a discussion of Claimant's medical history and the November 20, 2020 incident. *Id.* at 14-15. Following the examination itself, Dr. Didizian ruled out the existence of any cervical pathology, chronic damage to Claimant's shoulders or arms, carpal tunnel syndrome, or ulnar tunnel syndrome. *Id.* at 43. Based on his IME findings as well as the fact that Claimant resumed full-duty work for nine

---

[6] Here, Dr. Paiste was referring to surgery that he planned to perform on Claimant's left shoulder to remove "inflamed or frayed or damaged tissue." Paiste Dep. at 43. Dr. Paiste attributed the need for that surgery to the November 20, 2020 incident. *Id.* at 44.

months in 2021, Dr. Didizian concluded that Claimant "was fully recovered from the injuries of [November 20, 2020]." *Id*. at 47. Dr. Didizian opined that, if Claimant sustained any injuries on the day of the incident, they most likely consisted of a soft-tissue sprain or strain of soft tissue, which typically resolves within four to six weeks. *Id.* at 44, 62-63.

## F. WCJ DiLorenzo's Decision

In a September 15, 2023 decision, WCJ DiLorenzo denied and dismissed the Review and Claim Petitions. WCJ Decision, Order. Regarding the Review Petition, WCJ DiLorenzo pointed out that Claimant bore the burden of proving that the NTCP was materially incorrect. *Id.*, Conclusion of Law (C.L.) No. 5. WCJ DiLorenzo found that Claimant failed to do so, "particularly [in light of] Dr. Didizian's testimony." *Id.*

Regarding the Claim Petition, WCJ DiLorenzo first summarized the elements of a psychological injury claim under the "physical/mental" analysis. WCJ DiLorenzo then stated that

> Claimant didn't sustain [his] burden and establish his entitlement to workers' compensation for the alleged work injury on November 20, 2020[,] under the physical/mental standard and on the basis of his lack of treatment on or about November 20, 2020, until March 3, 2022[,] by Dr. Paiste, and before any diagnosis of [PTSD].

*Id.*, C.L. No. 3. WCJ DiLorenzo then summarized the elements of a claim under the "mental/mental" analysis and concluded that Claimant failed to meet his burden in that regard as well, particularly in light of Supt. Bernhardt's testimony. *Id.*, C.L. No. 4.

Regarding the fact witnesses, WCJ DiLorenzo first noted her finding that Claimant was "credible to an extent," particularly with regard to his recollection of

the November 20, 2020 incident. *Id.*, F.F. No. 18. However, WCJ DiLorenzo found Claimant not credible with regard to any lingering injuries to his left shoulder or elbow, since his complaints were not corroborated by the medical records from Penn Presbyterian, the report completed by Township police immediately following the incident, or by Dr. Didizian's testimony. *Id.*, F.F. No. 19. WCJ DiLorenzo also found Claimant

> not credible about his continued visits until April 2022 with Dr. McLaughlin and worsening mental condition from March 1, 2021[,] to December 17, 2021[,] because Dr. McLaughlin didn't testify at all, let alone about the aforesaid, and because Dr. Solomon didn't attest to a worsening of [] Claimant's condition during [his] work from March 1, 2021[,] to December 17, 2021."

*Id.* By contrast, WCJ DiLorenzo found Supt. Bernhardt "entirely credible," particularly on the subject of "yearly training for firearms and the use of force for violent subjects." *Id.*, F.F. No. 20. "With his vast experience and reputable background and with no expert opinion to the contrary," WCJ DiLorenzo continued, "[Supt.] Bernhardt is especially credible when he testified that it's not uncommon for a police officer in this day and age to have to discharge a firearm and to take someone's life in this country where we live." *Id.*

Regarding the medical experts, WCJ DiLorenzo credited Dr. Didizian's testimony over Dr. Paiste's on the ground that the former "has better credentials for the determination and causation of upper extremity, inclusive of elbow and shoulder, injuries" such as those allegedly sustained by Claimant. *Id.*, F.F. No. 21. As for Dr. Solomon's testimony addressing Claimant's claim of mental injuries, WCJ DiLorenzo found it not credible for the following reasons:

17

1.) Dr. Solomon testified that the Claimant sustained physical injuries to the left shoulder, right elbow, and neck but the [NTCP] listed injuries to the throat, neck, and left hand and didn't list the right elbow, the [ER] records listed complaints about the neck and left wrist, hand, and shoulder pain and didn't mention the Claimant's right elbow and a diagnosis besides an assault as opposed to injuries, and the [Incident Report] mentioned alleged injuries to the Claimant's throat, neck, left hand, and shoulder and all of those statements negated Dr. Solomon's understanding of the Claimant's alleged injuries; 2.) Dr. Solomon testified that the Claimant "initially self-medicated" at the time of Dr. McLaughlin's examination on November 24, 2020 but the Claimant's testimony established self[-]medication with alcohol after the Claimant's return to work sometime during the period from March 1, 2021 to December 17, 2021 and didn't support Dr. Solomon's history; and 3.) Dr. Solomon testified that on March 28, 2022, the Claimant displayed symptoms of anhedonia or lack of positive emotions with activities with previous positive emotions and decreased libido, among others, but the Claimant's testimony didn't mention any of the aforesaid and all of Dr. Solomon's delineated symptoms in support of Dr. Solomon's testimony.

*Id.*, F.F. No. 22. Accordingly, WCJ DiLorenzo rejected Dr. Solomon's conclusion that Claimant suffered from PTSD and reasoned that there was no "compensable mental injury as a result of the incident on November 20, 2020." *Id.*

Claimant appealed to the Board, arguing, *inter alia*, that WCJ DiLorenzo capriciously disregarded Dr. Solomon's "uncontroverted" testimony, failed to provide adequate reasoning for her partial rejection of Claimant's or Dr. Paiste's testimony, and erroneously concluded that the NTCP's injury description was accurate. C.R., Item No. 9. The Board affirmed by a 4-2 vote. *See* C.R., Item No. 11. In a dissent, joined by Commissioner Gabig, Commissioner Krebs reasoned that the injuries acknowledged in the NTCP constitute "a sufficient physical stimulus for a physical/mental claim." *Id.* at 25 (citing *Sch. Dist. of Phila. v. Smith* (Pa. Cmwlth.,

18

No. 1113 C.D. 2022, filed Aug. 22, 2023) (unreported), 2023 WL 5355360).[7] Commissioner Krebs also noted that he "would remand for the WCJ to revisit the PTSD claim." *Id.* This appeal followed.[8]

## II. Issues

On appeal, Petitioner argues that WCJ DiLorenzo erroneously applied the mental/mental burden of proof to his mental injury claim rather than the appropriate physical/mental burden of proof. In the alternative, Petitioner asserts that even if the mental/mental standard had been correctly applied, the record clearly indicates that he endured abnormal working conditions in the November 20, 2020 incident. Finally, Petitioner argues that WCJ DiLorenzo's decision contravenes the Act's humanitarian purposes.

---

[7] In *Smith*, this Court considered the case of a teaching assistant who, while eight months pregnant, was punched in the stomach by a student after she denied his request to share her lunch with him. Slip op. at 2-3. After monitoring the claimant for four hours out of concern that her placenta could rupture, the school nurse sent her home with instructions to take Tylenol for her pain. *Id.*, slip op. at 3. Although the claimant fully recovered from the physical injury, she was diagnosed with PTSD due to anxiety, lack of sleep, and flashbacks from the school incident. *Id.*, slip op. at 4. The claimant, who did not return to work, prevailed before a WCJ and was awarded disability benefits on the basis of a physical/mental injury; after remanding for reasons not pertinent here, the Board affirmed. *Id.*, slip op. at 9-10. On the employer's appeal, we affirmed, holding that the physical mental standard does not require a claimant to have "suffer[ed] a disabling injury" or to have "receiv[ed] extensive and/or repeated medical treatment for a work-related injury." *Id.*, slip op. at 18.

Unreported opinions of this Court filed after January 15, 2008, may be cited for their persuasive value. Pa.R.A.P. 126(b); 210 Pa. Code § 69.414(a).

[8] This Court's review is limited to determining whether the necessary findings of fact were supported by substantial evidence, constitutional rights were violated, or errors of law were committed. *Borough of Heidelberg v. Workers' Comp. Appeal Bd. (Selva)*, 928 A.2d 1006, 1009 (Pa. 2007).

### III. Discussion

Workers' compensation claims involving mental injuries fall into one of three categories: (1) mental/physical injuries, where a psychological stimulus causes a physical injury; (2) physical/mental injuries, where a physical stimulus causes a psychic injury; and (3) mental/mental injuries, where a psychological stimulus causes a psychic injury. *Ryan v. Workers' Comp. Appeal Bd. (Cmty. Health Servs.)*, 707 A.2d 1130, 1133-34 (Pa. Cmwlth. 1998). When a claimant asserts a claim under the physical/mental standard, the claimant must establish that the mental injury resulted from a triggering physical stimulus and arose during the course of employment. *Murphy v. Workers' Comp. Appeal Bd. (Ace Check Cashing, Inc.)*, 110 A.3d 227, 234 (Pa. Cmwlth. 2015). In other words, a claimant must prove that a physical work injury requiring medical treatment caused a psychological injury. *Frankiewicz v. Workers' Comp. Appeal Bd. (Kinder Morgan, Inc.)*, 177 A.3d 991, 996 (Pa. Cmwlth. 2017). Conversely, a claimant will be entitled to compensation for a mental/mental injury if he can demonstrate that the injury resulted from abnormal working conditions, not merely the result of a subjective reaction to normal working conditions. *RAG (Cyprus) Emerald Res., L.P. v. Workers' Comp. Appeal Bd. (Hopton)*, 912 A.2d 1278, 1286 (Pa. 2007). The determination of whether a claimant established an abnormal work condition is a question of law that is fully reviewable on appeal. *McLaurin v. Workers' Comp. Appeal Bd. (Southeastern Pa. Transp. Auth.)*, 980 A.2d 186, 189 (Pa. Cmwlth. 2009).

### A. The Physical/Mental Standard

Claimant first argues that WCJ DiLorenzo "committed clear errors of law by denying [him] the physical/mental burden of proof in this matter." Claimant's Br. at 21. For factual support, Claimant turns to the Incident Report "confirming the

violent struggle" in which he was engaged on November 20, 2020, as well as the ER records showing that he presented "after an assault at work" with complaints of "neck pain, left wrist pain, hand pain, and left shoulder pain," as well as the medical-only NCP listing work injuries. *Id.* at 19-20. Given the above documentation, Claimant maintains that his "physical injuries due to the violent assault cannot be fairly disputed and he is entitled to the physical/mental standard for the PTSD claim." *Id*. at 26.

In further support, Claimant likens his situation to those of successful claimants in three prior decisions by this Court: *Donovan v. Workers' Compensation Appeal Board (Academy Medical Realty)* 739 A.2d 1156 (Pa. Cmwlth. 1999); *Bartholetti v. Workers' Compensation Appeal Board (School District of Philadelphia)*, 927 A.3d 743 (Pa. Cmwlth. 2007); and *New Enterprise Stone & Lime Company v. Workers' Compensation Appeal Board (Kalmanowicz)*, 59 A.3d 670 (Pa. Cmwlth. 2012). In *Donovan*, we held that injuries sustained by a dentist's office janitor from being stuck in the hand with improperly disposed-of hypodermic needles, though neither "disabling" nor "prolonged," constituted "injury caus[ing] a disability as defined by the Act." 739 A.2d at 1162. In *Bartholetti*, this Court reversed the Board and reinstated a WCJ's award of benefits to the claimant elementary school teacher, who sustained non-disabling injuries when a fourth-grader bit her on the forearm and subsequently developed anxiety and depression. 927 A.2d at 748.

Finally, in *Kalmanowicz*, a road equipment operator was involved in a head-on collision with an apparently suicidal motorist who died on impact with the claimant's vehicle, as the claimant watched. *Id.* at 672. The claimant's vehicle crashed into an embankment as a result of the collision, but the claimant himself

21

managed to crawl away with only bruising and discomfort. *Id.* at 673. Subsequently, however, he began exhibiting symptoms of PTSD and was ultimately awarded a claim petition for mental disability. *Id.* at 672. Affirming the Board, this Court held that a "triggering physical event" was sufficient to satisfy the claimant's burden of proof under the physical/mental standard. *Id.* at 677.

We disagree that any of the foregoing cases controls here, because this Court's understanding of the physical/mental standard underwent a significant development with our subsequent *Murphy* decision. In that case, the claimant was the manager of a check-cashing business that was subject to an armed robbery on the morning of June 19, 2010. 110 A.3d at 230. During the robbery, the claimant was forced at gunpoint to open the business's safes before being hogtied by the robber. *Id.* After the claimant managed to call 9-1-1 with a mobile phone in her pocket and police arrived, she was taken to a hospital for chest pains and trouble with breathing and speaking. *Id.* Two days later, the claimant visited her family physician with complaints of pain in her upper back, shoulders, and neck. *Id.* Meanwhile, her employer issued a notice of compensation denial, prompting a claim petition by the claimant. *Id.* Applying the mental/mental burden of proof, a WCJ denied the claim petition on the ground that an armed robbery did not constitute an abnormal working condition. *Id.* at 233. On appeal, the Board held that the WCJ's application of the mental/mental standard was in error but nonetheless affirmed on the ground that the claimant's injuries were insufficient for a physical/mental claim. *Id.* The claimant appealed to this Court.

Vacating the Board's order, we held in *Murphy* that the physical injury under the physical/mental standard need not be disabling, but that it must have required medical treatment. *Id.* at 237. We explained that the claimant's mental injury was

22

attributable to "her entire experience of the June 19, 2010 armed robbery" rather than the "slight bruising" sustained in the incident. *Id.* at 238. Thus, we concluded that minor physical harm which is ancillary to an emotionally upsetting experience is insufficient to meet the physical stimulus requirement. As Senior Judge Leadbetter observed in her concurring opinion in *Murphy*, "the distinction between physical/mental and mental/mental injuries would be unmanageably blurred if a 'physical stimulus' which caused little or no physical injury, and did not cause the mental injury but only occurred incidental to a traumatic event, would transform a mental/mental claim into a physical/mental claim." *Id.* at 241 (conc.).

In this case, WCJ DiLorenzo correctly pointed out that the files from the Penn Presbyterian ER recorded only complaints of soreness and pain and that, without any treatment administered, Claimant was discharged and permitted to walk out on his own. *See* WCJ Decision, F.F. No. 17. Thus, WCJ DiLorenzo properly concluded that Claimant was "overall well on November 20, 2020, and . . . wasn't diagnosed with any medical condition" on that day. *Id.* In other words, Claimant's pain and soreness complaints, like the *Murphy* claimant's symptoms, were secondary to a *mentally* injuring event and were themselves not serious enough to require medical treatment. We therefore conclude that the physical/mental standard is inapplicable to the instant matter.[9]

---

[9] Claimant also relies on *Smith*, the case cited by Board Commissioner Gabig in his dissent below. While we acknowledge that the claimant in that case prevailed even though her injuries were neither prolonged nor serious, we must decline to give credence to Claimant's arguments on that basis, since *Smith* is an unreported decision and not binding on this Court.

Furthermore, *Smith's* analysis appears to sidestep this Court's more recent physical/mental case law by relying primarily on pre-*Murphy* precedents, primarily *Kalmanowicz*. As President Judge Cohn Jubelirer noted in a dissenting opinion, it is "inconsistent with our case law to hold that four hours of observation and advice to take over-the-counter medication for discomfort, if needed," is sufficient for the physical/mental standard, and that doing so "eviscerate[s] the current

**(Footnote continued on next page…)**

23

## B.  The Mental/Mental Standard

We next address Claimant's argument that, even if the mental/mental standard is the correct one in this case, he should still prevail.  In his Brief, Claimant observes that an employee who brings a disability claim under the mental/mental standard must establish that the incident whence the injury arose "was abnormal," that a psychological injury has been verified, and that the injury has been traced to an identifiable source—i.e., the abnormal work event.  Claimant's Br. at 28 (citing *Payes v. Workers' Compensation Appeal Board (PA State Police)* (*Payes II*), 79 A.3d 543, 555-56 (Pa. 2013)).  In Claimant's view, uncontested evidence "confirms that the physical life[-]and[-]death struggle that ended with a perpetrator's death is objectively an abnormal event" and, furthermore, that Claimant's disabling PTSD symptoms are traced to that event.  *Id.* at 31.  We therefore evaluate both of these claims.

### 1.  The Abnormal Working Condition

After this Court held in *Murphy* that the physical/mental standard was inapplicable, we remanded with the instruction that a WCJ reconsider the case in light of our Supreme Court's then-recent decision in *Payes II.*  In that case, the claimant was a 12-year veteran state trooper who was driving on an interstate highway before dawn when his patrol vehicle struck a woman who had suddenly run into the road.  79 A.3d at 568-69.  The trooper rushed out of the vehicle to attend to the woman and, in a desperate attempt to revive her, administered mouth-to-mouth

---

medical treatment requirement by essentially enabling any claimant who suffers a work-related injury . . . to go to a medical professional to have it examined and be inevitably advised to take something for pain or follow up if needed, to claim recovery for any resulting mental injury therefrom."  *Smith*, slip op. at 3 (Cohn Jubelirer, J., dissenting).  Accordingly, we believe that permitting Claimant to avail himself of the physical/mental standard here would represent an ill-advised deviation from our most recent case law on the subject.

24

resuscitation. *Id.* at 569. Simultaneously, the trooper—who stopped his patrol vehicle in a traffic lane—had to direct oncoming traffic to protect himself and the dying woman. *Id.* While the woman was pronounced dead at the scene, the trooper was taken to a hospital for testing connected to his exposure to the deceased woman's blood. *Id.* The trooper returned to work approximately one month later but left again due to symptoms that were later recognized to be consistent with PTSD. *Id.* Applying the mental/mental standard, a WCJ awarded a claim petition on the ground that "the particular work-related mental stimulus . . . was not one normally encountered by or expected of state troopers." *Id.* at 571. The Board reversed, holding that, while "being involved in a fatal accident may be traumatic and not routine for a state trooper, [the Board] cannot agree that [the] incident constitutes an abnormal working condition." *Id.* at 571-72.

Affirming the Board, this Court noted that a state trooper "can be expected to be witness to horrible tragedy." *Payes v. Workers' Comp. Appeal Bd. (Commonwealth of Pa./State Pol.)* (*Payes I*), 5 A.3d 855, 861 (Pa. Cmwlth. 2010). Reasoning that "it is not beyond the realm of possibility for an officer to have to take someone's life," we noted that a trooper's attempt to administer mouth-to-mouth resuscitation "[did] not appear extraordinary for a police officer," that "a person dying following a failed attempt at resuscitation is something that can be expected to occur in a police officer's line of work," and that there was "no question that any resulting psychological injury would not be compensable" had it not been the trooper's own patrol vehicle that had struck the deceased woman. *Id.* at 861. This Court further pointed out that the record implied the occurrence of one other incident where someone was fatally struck by a state trooper's patrol vehicle. *Id.* at 862.

25

Thus, we concluded that "the facts as a whole show the relative 'ordinary' nature of the events that transpired in this case." *Id.*

The trooper appealed to our Supreme Court, which noted that, "[a]lthough the ultimate determination of whether an employee has established "abnormal working conditions" is a question of law reviewable on appeal . . . 'psychic injury cases are highly fact-sensitive[,] and for actual working conditions to be considered abnormal, they must be considered in the context of specific employment.'" *Payes II*, 79 A.3d at 552 (citing *Wilson v. Workmen's Comp. Appeal Bd. (Aluminum Co. of Am.)*, 669 A.2d 338, 343 (Pa. 1996)). While analyzing that context, the Supreme Court expressed displeasure with this Court's approach in *Payes I* of breaking the entire incident into component parts, "where each part, standing on its own, might be safely determined to be a 'normal' working condition for a police officer." *Id.* at 554. Dismissing the notion that the incident was in any way routine for a state trooper, the Supreme Court held:

> The fact that another state trooper had once struck a pedestrian does not make the incident here a "normal" working condition. Abnormal working conditions need not be "unique" working conditions. . . . Indeed, by any measure, and irrespective of [the trooper's] testimony, what happened here was an extraordinary event. For this reason, we hold here that as a matter of law, such a singular extraordinary event is an "abnormal" working condition.

*Id.* at 556 n.8 (emphasis added). Accordingly, the Supreme Court reversed this Court and reinstated the WCJ's award of benefits. *Id.* at 557.

In this case, Claimant maintains that his "uncontested diagnosis with PTSD and disability were caused by rare and objectively abnormal events for a police officer." Claimant's Br. at 35. Claimant likens the November 20, 2020 incident to the one encountered by the state trooper in *Payes*, calling his own experience "highly

26

unusual and singular." Claimant's Br. at 33 (citing *Payes II*, 79 A.3d at 556). In Claimant's view, Supt. Bernhardt's testimony actually buttresses this contention, because Supt. Bernhardt acknowledges that Township police officers "do not shoot people regularly" and that Supt. Bernhardt himself has never discharged a service weapon while on duty in his 27 years in law enforcement. *Id.* Claimant contends that the only way WCJ DiLorenzo could have reached a contrary conclusion is by relying on her subjective belief that discharging a firearm "does not seem . . . to be unusual and abnormal." 4/26/2023 Hr'g Tr. at 33.

We agree with Claimant. WCJ DiLorenzo's finding that the November 20, 2020 incident "was a normal[-]type condition for a police officer who works in [the] Township," WCJ Decision, F.F. No. 7(e), is erroneous for two main reasons. The first is that WCJ DiLorenzo focuses on one aspect or another of the incident rather than the full convergence of events. For example, in Finding of Fact 7(e), WCJ DiLorenzo characterizes the incident as one in which Claimant "discharged his firearm." It has never been Claimant's contention in this case that the November 20, 2020 incident was abnormal strictly because of the necessity of using his firearm, or even strictly because of the necessity of taking someone's life. To frame it as such is to engage in the flawed reasoning that our Supreme Court cautioned against in *Payes II*, because it casts the full incident in a deceptively "normal" light.

The second reason that WCJ DiLorenzo's conclusion is erroneous is that it is not even supported by the testimony cited as its basis. Supt. Bernhardt's bare assertion that such incidents as the one that occurred November 20, 2020, can be normal for a Township police officer is belied by his acknowledgement that there has been no other fatal officer-involved shooting in the Township in the years since he became Superintendent, that Claimant has only discharged his service weapon on

27

3 or 4 occasions in the past, and that Superintendent has never discharged his own while on duty in his 27 years as a law enforcement officer. On November 20, 2020, Claimant not only discharged his service weapon, but was forced into hand-to-hand combat with Mr. Laudermilt, placed into a chokehold so aggressive that he was lifted off the ground, was nearly deprived of his duty belt when Mr. Laudermilt pulled it away with such force that Claimant's belt loops were torn, and nearly lost control of his service weapon, which placed him in reasonable fear that his own death was imminent. Once Claimant reasserted control of his service weapon, he had to shoot Mr. Laudermilt at such close range that he witnessed changes in Mr. Laudermilt's facial expressions and movements in the fabric of his shirt; subsequently, Claimant tried (like the trooper in *Payes II*) to perform life-saving measures in an attempt to keep the bloodied Mr. Laudermilt alive but did not succeed. Nowhere in Supt. Bernhardt's testimony is there support for the notion that this chain of events is of a kind that a Township police officer, or any police officer, may normally expect to encounter at the beginning of a workday; to the contrary, his testimony militates against such a conclusion.

We acknowledge that mental injury cases are "highly fact-sensitive," *Payes II* at 552, and that such a fact-intensive inquiry normally calls for deference to the WCJ's factual findings.[10] Nonetheless, we reiterate that "the ultimate determination

---

[10] The Dissent contends that the November 20, 2020 event cannot be considered an abnormal working condition because it "remains within the type of event that law enforcement officers unfortunately encounter in the performance of [their] duties." *Russo v. Upper Darby Twp. (Workers' Comp. Appeal Bd.)*, ___ A.3d ___ (Pa. Cmwlth., No. 1093 C.D. 2024, filed December 5, 2025) (Fizzano Cannon, J., concurring/dissenting), slip op. at 3. Claimant, in the Dissent's view, was engaged in nothing other than "police work" when he was injured—in contrast to the claimant in *Payes II*, whose accident "could have happened to any driver on the highway at that moment." *Id.* The Dissent thus likens the fact pattern in this case to those "collected in *Payes II* where benefits have been denied to law enforcement officers" who were engaged in similarly foreseeable **(Footnote continued on next page…)**

of whether an employee has established 'abnormal working conditions' is a question of law reviewable on appeal." *Id.* In this instance, the underlying facts are so egregious, and WCJ DiLorenzo's effort to maintain a contrary conclusion so lacking in support, that we hold as a matter of law that Claimant was subject to abnormal working conditions on November 20, 2020.

---

activities. *Id.* These include the case of a police officer who arrived in response to a call upon a scene where two fellow officers were seriously injured (*Rydzewski v. Workers' Compensation Appeal Board (City of Philadelphia)*, 767 A.2d 13, 13 (Pa. Cmwlth. 2001)); that of an officer who was embroiled in a scuffle with a gun-wielding suspect before subduing him and taking him into custody (*Young v. Workers' Compensation Appeal Board (New Sewickley Police Dep't)*, 737 A.2d 317, 318 (Pa. Cmwlth. 1999)); that of an officer whose fatal shooting of an unarmed suspect was followed by criminal charges for the officer, a trial, and "a great deal of media scrutiny" (*City of Philadelphia v. Workers' Compensation Appeal Board (Brasten)*, 728 A.2d 938, 940 (Pa. 1999)); and that of an officer whose preexisting anxiety and depression were exacerbated by his involvement in an eight-hour standoff with a barricaded gunman (*Parson v. Workmen's Compensation Appeal Board (Springettsbury Township)*, 642 A.2d 579, 580 (Pa. Cmwlth. 1994)).

The Majority rejects the suggestion that any incidents falling within the scope of a law enforcement officer's duties cannot also constitute an abnormal working condition. Such a blunt conclusion would run afoul of our Supreme Court's clear instruction in *Payes II* to avoid imposing "a bright line test or a generalized standard" when classifying working conditions as normal or abnormal. *Payes II*, 79 A.3d at 552 (citing *RAG (Cyprus) Emerald Res.*, 912 A.2d at 1288). As explained *supra*, the Majority's conclusion that Claimant experienced an abnormal work event is based on the full convergence of events that transpired on that day. *Rydzewski* is distinguishable because the officer in that case was not involved in the action that left his fellow officers injured. *Young* is distinguishable because no lives were lost in the scuffle between the officer and the suspect in that case. *Brasten* is distinguishable because the mental injury claim in that case was focused entirely on "the events subsequent to the shooting," i.e., the criminal proceeding and media coverage. 728 A.2d at 940. *Parson* is distinguishable because that claimant was never engaged in hand-to-hand combat or placed in reasonable fear for his life.

The learned Dissent's attempt to place the fact pattern in this case in the above group of unsuccessful claims only holds water if we were "to disregard the total, singular nature of the event . . . and to analyze the event as a series of unrelated component parts." *Payes II*, 79 A.3d at 548-49. Such a narrow focus not only runs afoul of our Supreme Court's clear instruction but loses sight of the basic question before this Court—i.e., whether what happened in this case "was an extraordinary event" and therefore "an 'abnormal' working condition" as a matter of law. *Id.* at 586 n.8. And to be clear, the Majority's conclusion is based on the specific evidence within the entirety of the record, not just prior case law.

## 2. Claimant's Medical Evidence

Next, we evaluate Claimant's contention that he has presented "uncontested" objective evidence that he suffered a mental injury and resultant disability. Claimant's Br. at 36. Generally, a claimant must present unequivocal medical testimony to establish the causal connection between an alleged injury and the work-related incident. *Indus. Recision Servs. v. Workers' Comp. Appeal Bd. (Farbo)*, 808 A.2d 994, 997 (Pa. 2002). As "a fact-sensitive inquiry," it requires us to defer to the WCJ's factual findings, which we may overturn only if they are unsupported, arbitrary, or capricious. *RAG (Cyprus) Emerald Res.*, 912 A.2d at 1286.

Instantly, WCJ DiLorenzo listed three reasons for her wholesale rejection of Dr. Solomon's testimony. First, WCJ DiLorenzo noted discrepancies between the physical injuries noted by Dr. Solomon and those physical injuries listed on the NTCP, in the ER records, and in the Incident Report. WCJ Decision, F.F. No. 22. Second, WCJ DiLorenzo found Dr. Solomon's chronology flawed when he recounted "self-medicat[ion]" by Claimant at the time of his first examination on November 24, 2020, whereas Claimant himself reported self-medication through alcohol sometime after his March 1, 2021 return to work. *Id.* Third, WCJ DiLorenzo found Dr. Solomon not credible because he reported anhedonia, decreased libido, and other deficits of "positive emotions" in Claimant, while WCJ DiLorenzo did not recall Claimant addressing that subject in his own testimony. *Id.*

The reasons cited by WCJ DiLorenzo for rejecting Dr. Solomon's testimony are, to put it bluntly, nonsensical. As for the first reason, it is true that there are discrepancies between Dr. Solomon's summary of Claimant's physical injuries and those given in the ER records, the Incident Report, and the medical-only NCP. However, there should be no need to point out that Dr. Solomon is a clinical

30

psychologist who has only been called upon to diagnose, treat, and testify on Claimant's *mental* injuries. A reasonable observer would not expect Dr. Solomon to be deeply familiar with the details of Claimant's shoulder pain any more than an orthopedic surgeon would be expected to know Claimant's PHQ-9 score for depression symptoms. WCJ DiLorenzo's critique of Dr. Solomon's testimony is even less reasonable in light of the fact that the documents to which she unfavorably compares Dr. Solomon's testimony are *inconsistent with one another* as to Claimant's physical injuries.[11] In other words, WCJ DiLorenzo applied an arbitrary level of scrutiny to Dr. Solomon's testimony that would have been impossible to satisfy.

The second reason given by WCJ DiLorenzo for rejecting Dr. Solomon's testimony stems from a clear mischaracterization of his words. When Dr. Solomon employed the phrase "at that time" while describing Claimant's self-medication through drinking, the context makes clear that he was referring to an indeterminate point *following* Dr. McLaughlin's initial evaluation, not concurrent with that initial evaluation. WCJ DiLorenzo's interpretation not only disregards that immediate context but contradicts a key conclusion of Dr. Solomon's testimony, which is that Claimant exhibited a "delayed onset" of PTSD symptoms—that is, surfacing "as the days and the weeks go by"—rather than in the incident's immediate aftermath. *See* Solomon Dep. at 30-31. Thus, even assuming without conceding that the phrase cited by WCJ DiLorenzo was a stray inaccuracy, to reject Dr. Solomon's testimony on that basis is to disregard "the well-established principle that medical testimony

---

[11] For example, the ER records note "neck soreness" and "shoulder soreness," while the medical-only NCP lists a "[s]train or tear" of the shoulder or shoulders and omits any mention of neck ailments. C.R., Item Nos. 19, 25. Yet, WCJ DiLorenzo credited the former in full, WCJ Decision, F.F. No. 8, and found the latter "[not] materially incorrect," F.F. No. 23.

and evidence must be viewed as a whole, not as isolated expressions." *Martin v. Workers' Comp. Appeal Bd. (Red Rose Transit Auth.)*, 783 A.2d 384, 389 (Pa. Cmwlth. 2001).

WCJ DiLorenzo's third reason for rejecting Dr. Solomon's opinions betrays a fundamental misunderstanding of the purpose of expert medical testimony. There is no principle in our workers' compensation case law or the Act itself requiring a claimant to reiterate every point made by his medical witness in his own testimony in order establish the medical witness's credibility. That Claimant did not expressly refer in his testimony to anhedonia—a technical term seldom used in everyday speech except, presumably, by mental health professionals such as Dr. Solomon—does nothing to undermine the authority of his expert medical evidence. A reasonable observer would find it entirely sufficient that Claimant testified at length about the profound decline in his emotional state before his eventual treatment with Dr. Solomon. Such elements of Claimant's testimony corroborate, rather than undermine, Dr. Solomon's conclusions.

It should be emphasized that this Court is generally loath to disturb a WCJ's factual findings. We must decline to do so as long as "there is substantial evidence in the record to support those findings." *City of Phila. v. Bell*, 335 A.3d 398, 403 (Pa. Cmwlth. 2025). In this case, Claimant presented unrebutted expert testimony from a medical professional whose competence was never challenged, whose conclusions were never called into question by another expert's conclusions, and whose credibility no valid reason has been given to repudiate.[12] That expert testified

---

[12] We further observe that WCJ DiLorenzo's findings on Dr. Solomon's testimony, though styled only as credibility determinations, appear to address the additional issue of his *competence*. A medical witness's testimony is deemed incompetent if "lacks a proper foundation upon which [his] conclusion could be based," *City of Williamsport v. Workers' Comp. Appeal Bd. (Cole* **(Footnote continued on next page…)**

unequivocally that Claimant is unable to return to his preinjury job due to his struggles with PTSD. The record does not support WCJ DiLorenzo's findings; rather, it underscores those findings' flaws. Accordingly, we find that her rejection of Dr. Solomon's testimony constituted reversible error.

### C. The Act's Humanitarian Purposes

We now address Claimant's argument that WCJ DiLorenzo's decision was inimical to the humanitarian purposes of the Act. Claimant observes that this Court has construed the Act liberally in order to further the objective of benefitting workers who suffer from work-related injuries. In contrast, Claimant argues, WCJ DiLorenzo's decision that the violent struggle for his life occurring on November 20, 2020, constitutes a normal working condition "offends the humanitarian purposes of the Act and is plainly unjust." Claimant's Br. at 36-37. If the uncontested record evidence in this case "does not support the award of benefits to [him] for PTSD in this instance . . . [then] police officers are completely and unfairly excluded from receiving benefits for PTSD," Claimant argues. *Id.* at 37.

At the outset, we point out that even a strict construction of the Act militates in favor of reversing WCJ DiLorenzo's deeply flawed decision. Thus, while it is true that we have gravitated toward a liberal construction of the Act in order to favor

---

*(Deceased))*, 145 A.3d 806, 812 (Pa. Cmwlth. 2016), or if it is based solely on "inaccurate or false information," *Am. Cont. Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001). As a question of law, the issue of a medical witness's competence is fully reviewable by this Court on appeal. *Sarmiento-Hernandez v. Workers' Comp. Appeal Bd. (Ace Am. Ins. Co.)*, 179 A.3d 105, 111 n.7 (Pa. Cmwlth. 2018).

Instantly, Dr. Solomon testified that his conclusions were founded upon his training and experience as a clinical psychologist and by his treatment of Claimant for his PTSD symptoms. Furthermore, notwithstanding WCJ DiLorenzo's ill-founded conclusions to the contrary, there is no reason to infer that Dr. Solomon's testimony was based on inaccurate or false information. Thus, to the extent that WCJ DiLorenzo's criticisms of Dr. Solomon's testimony go to his competence rather than his credibility, we hold as a matter of law that her determinations are erroneous in that regard as well.

the compensation of workers injured on the job, that principle has no bearing on our holding here. However, we take this opportunity to register our grave concern with WCJ DiLorenzo's cavalier treatment of the facts in this case. This is displayed not only in her written decision but in her interruption of Claimant's counsel at the April 26, 2023 hearing to editorialize that the discharge of an officer's weapon did not seem to her like an abnormal working condition, based on the utterly irrelevant fact that she is a native of Philadelphia.

We find WCJ DiLorenzo's outburst to be of particular concern for two key reasons. The first is that the Act's regulations are crystal clear that a WCJ is to "conduct fair and impartial hearings" and to "maintain order." 34 Pa. Code § 131.43(a). WCJ DiLorenzo failed to carry out these duties when she disrupted the examination of a witness on a highly sensitive matter in order to provide her own arguments on the Township's behalf.

The second reason is that, by focusing on the narrow question of whether the discharge of an officer's weapon is abnormal, WCJ DiLorenzo was, again, exhibiting exactly the kind of myopic and distorted view of the incident that our Supreme Court warned against in *Payes II*. If a law enforcement officer's mental injury claim is to be analyzed by breaking a traumatic event into constituent sub-events—any one of which can be reasonably seen as a normal occurrence in their occupation—then it is difficult to see how law enforcement officers can ever hope to prevail under the mental/mental standard. As Claimant suggests, this approach effectively shuts out law enforcement officers from compensation for mental injuries simply because certain dangerous incidents, such as scuffles with aggressive suspects, are relatively routine for them. To avoid this clearly unjust result, we hold that, when two or more such dangers converge into a highly unusual event such as

34

the one that Claimant experienced on November 20, 2020, the event must be analyzed as a whole in order to determine whether it constitutes an abnormal working condition.[13] We believe that this approach brings our case law into accord not only with the holding in *Payes II* but with the Act's broader humanitarian purposes.

## IV. Conclusion

Under the so-called mental/mental standard, a workers' compensation claimant must establish a verifiable psychological injury and a causal connection to abnormal working conditions. In this case, Claimant presented uncontroverted evidence that he sustained PTSD as a result of the November 20, 2020 incident and that the incident was, as a matter of law, abnormal. WCJ DiLorenzo's conclusions to the contrary are arbitrary, capricious, and lacking in support in the record. We therefore reverse and remand to the Board with instructions to remand to a WCJ for the entry of an order granting Claimant's Claim and Review Petitions and assessing

---

[13] While we have determined that the November 20, 2020 incident constituted an abnormal working condition by any reasonable standard, we also recognize the inherent difficulty facing first responders—for whom mentally disturbing work experiences are not exceptionally rare—in meeting the relevant burden of proof. The General Assembly has, fortunately, responded to this issue with the enactment of Section 301(g) of the Act, added by Act of October 29, 2024, P.L. 1079, No. 121, § 2, effective October 29, 2025, 77 P.S. § 415. Relevantly, Section 301(g)(1) provides that a post-traumatic stress injury, when claimed by a first responder, "shall not be required to be the result of an abnormal working condition to be a compensable injury under this [A]ct." *Id.* § 415(1).

a proper calculation of wage loss benefits, statutory interest, and any other amounts due.[14]

 

 

 

 

_____

MATTHEW S. WOLF, Judge

---

[14] When this Court holds that a WCJ or the Board has committed reversible error on an issue involving questions of fact, our ordinary course is to remand with instructions to conduct additional findings, reconsider the evidence in the record, or to apply the correct legal standard. *See, e.g.*, *Puhl v. Workers' Comp. Appeal Bd. (Sharon Steel Corp.)*, 724 A.2d 997, 1003 (Pa. Cmwlth. 1999) (reversing the Board's denial of claimant's petition; remanding with the instruction that a WCJ shall hold a new hearing on medical evidence that the WCJ had previously disregarded). Two particularities of this case render that step largely unnecessary here. First, since we hold as a matter of law that Claimant was subject to an abnormal working condition, no further action by a factfinder is needed on that issue. Second, since the Township offered no expert witness of its own to counter Dr. Solomon's competent, unambiguous testimony linking Claimant's abnormal working condition to his mental injuries, we deem that issue to be waived. Accordingly, the only factual question remaining involves the proper award of benefits due to Claimant. *Cf. Sewell v. Workers' Comp. Appeal Bd. (City of Phila.)*, 772 A.2d 93, 98 (Pa. Cmwlth. 2001) (reversing the denial of a claim petition on the ground that the WCJ's decision was unsupported by substantial evidence; remanding solely to determine "an appropriate award of benefits").

Lastly, in light of the fact that Claimant did not appeal from WCJ DiLorenzo's finding that he did not sustain a disabling elbow injury as a result of the November 20, 2020 incident, it should be made clear that the Claim and Review Petitions are only to be granted as to his claim of disabling mental injuries.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steve Russo,                          :
                    Petitioner        :
                                      :
        v.                            :   No. 1093 C.D. 2024
                                      :
Upper Darby Township (Workers'        :
Compensation Appeal Board),           :
                    Respondent        :

# **O R D E R**

AND NOW, this 8th day of December 2025, the order of the Workers' Compensation Appeal Board in the above-captioned matter, dated August 2, 2024, is hereby REVERSED.  The matter is REMANDED to the Workers' Compensation Appeal Board, which is instructed to remand the matter to a Workers' Compensation Judge for the entry of an order consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
MATTHEW S. WOLF, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steve Russo,                  :
          Petitioner        :
                               :
      v.                    :    No. 1093 C.D. 2024
                               :    SUBMITTED: June 3, 2025
Upper Darby Township (Workers'    :
Compensation Appeal Board),       :
           Respondent     :

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE MATTHEW S. WOLF, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**CONCURRING OPINION BY**
**SENIOR JUDGE LEADBETTER**            **FILED: December 8, 2025**

I agree with the well-considered majority opinion. However, as Judge Fizzano Cannon aptly noted, I said the following in *Ganley v. Upper Darby Township (Workers' Compensation Appeal Board)*, ___ A.3d ___, ___ (Pa. Cmwlth., No. 770 C.D. 2024, filed Oct. 22, 2025) (Leadbetter, S.J., concurring), slip op. at 1-2:

> I write separately simply to note my view as to the continued viability of the "abnormal working conditions" doctrine. As noted by the majority, since 1972, Section 301(c)(1) of the Workers' Compensation Act has provided that, "An injury to an employee [is compensable], regardless of his previous physical condition, arising in the course of his employment and related thereto." Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1). Nonetheless, for decades we have required that a claimant who suffers a disabling *mental* injury must show not only that it was caused by his or her employment, but also that the cause sprang from some "abnormal" working condition(s). In other words, in contrast to the physical injury paradigm, a claimant with a more fragile pre-injury mental state is treated less favorably than his or her more resilient colleagues because he or she has had a "subjective" reaction to the event. We understand mental

injuries better today than we did even a few decades ago and ancient prejudices borne of lack of understanding are outdated and wrong. I would posit that all emotional reactions to disturbing events are "subjective" even though some reactions are more severe than others.

From the beginning, the "abnormal working conditions" doctrine has been unworkable, causing courts to struggle to draw elusive distinctions concerning what is normal or expected in any given line of work based on highly specific factual details, and too often based on anecdotal testimony regarding the perceived frequency of such incidents. What may be a "normal" experience for a police officer or a school teacher or a cashier in Philadelphia may be quite rare for such a professional in suburbia or rural areas, but the traumatic injuries can be the same and are no less real or disabling than physical injuries merely because we cannot see them. It seems to me that refusing to compensate a substantial proven injury is antithetical to the humanitarian purposes of the Act.

In short, while we are certainly bound by the precedents cited by the majority, I believe it is time to scrap the "abnormal working conditions" doctrine altogether and hold that if there is clear proof of a disabling work-related mental injury, it should be compensable.[FN]1

[FN]1 As noted by the majority, the General Assembly has abrogated this rule for first responders, with certain restrictions. *See* [*Ganley*, ___ A.3d at ___ n.10, slip op. at 19]. As this case illustrates, this is a salutary change in the law. However, I believe any workers experiencing mental disabilities from traumatic workplace events should be treated in the same manner and, since the "abnormal working conditions" restriction is a judge-made rule, the courts should eliminate it.

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

2 - BBL

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steve Russo,                :
            Petitioner    :
                :
     v.             :
                :
Upper Darby Township (Workers'  :
Compensation Appeal Board),   :   No. 1093 C.D. 2024
            Respondent  :   Submitted: June 3, 2025

BEFORE:   HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE MATTHEW S. WOLF, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

CONCURRING AND DISSENTING OPINION
BY JUDGE FIZZANO CANNON          FILED: December 8, 2025

I agree with the Majority that the lack of post-incident medical treatment here indicates that Claimant's physical pain and soreness were "secondary" to the mental components of his condition and that the physical/mental standard for a psychological injury was not applicable here. Majority Opinion, slip op. at 23.

However, I cannot agree with the Majority that the incident here qualifies as an abnormal working condition sufficient to support benefits under the mental/mental theory of recovery for psychological injuries. I do not discount the facts here or seek to improperly break the event into component parts, "where each part, standing on its own, might be safely determined to be a 'normal' working condition for a police officer," an approach that our Supreme Court denounced in *Payes v. Workers' Compensation Appeal Board (Pa. State Police)*, 79 A.3d 543, 554 (Pa. 2013) (*Payes II*).

In *Payes II*, the incident began when the claimant, a state trooper, was driving his patrol car on a highway on a dark morning. 79 A.3d at 545. A mentally ill woman dressed in black, and, therefore, even more difficult to see at the time, ran out onto the road in front of the claimant's vehicle. *Id*. He hit her, pulled over, and unsuccessfully tried to resuscitate her while keeping oncoming traffic diverted. *Id*. The claimant had to be tested to ensure that the woman's blood on him from the incident did not transfer any communicable diseases. *Id*. The claimant was out of work with permission for about a month, then returned briefly but was unable to continue due to stress and anxiety from the incident. *Id*. at 546.

Our Supreme Court ultimately upheld the WCJ's determination that state troopers "are not in the normal course of their duties exposed to the circumstances that occurred in this case; to wit[,] a mentally disturbed individual running in front of a [t]rooper's vehicle while he is operating the vehicle, for no apparent reason." 79 A.3d at 553. I read *Payes II* as concluding that what happened there was not intrinsic to the duties of a law enforcement officer and could have happened to any other driver on the road at that moment. That it happened to a state trooper made it abnormal working conditions for him.

Here, Claimant was advised to be "on the lookout" for an armed and dangerous man who had recently beaten up his girlfriend and was wanted in several other jurisdictions. Majority Opinion, slip op. at 3. Claimant, alone at the time, came across the man, attempted to arrest him, and a violent struggle ensued in an isolated area. *Id*. During the encounter, the two struggled for Claimant's service weapon; he reasonably feared for his life and shot the man at very close range. *Id*. Even then, the encounter continued for a time until assistance arrived and subdued

the man; Claimant tried to resuscitate the man, requiring further personal contact, but the man ultimately died from Claimant's gunshot. *Id*. at 4-5.

Acknowledging that this inquiry is both fact-sensitive and a question of law, I believe that this incident, replete with terrible facts that cannot be minimized, remains within the type of event that law enforcement officers unfortunately encounter in the performance of his or her duties. Police officers face the possibility of life-and-death situations every day as a necessary part of their work. Indeed, it is the nature of the danger and trauma inherent in their work that engenders our deep respect for police and other first responders. *Id.*

Unlike in *Payes II*, where the accident could have happened to any driver on the highway at that moment, this incident would be highly unlikely in a work context had Claimant not been a law enforcement officer. The cases collected in *Payes II* bear out this approach. Law enforcement officers have been awarded compensation where "a street gang, in retaliation for the officer killing a gang member in a shootout, placed a bounty on the life or health of the officer and his family" and where an officer was "subjected to false accusations by the chief of police, public airing of those accusations, suspension, termination, and stripping of his duties and authority upon reinstatement and deliberate ostracism instigated by the chief[.]" 79 A.3d at 552-53. These were truly abnormal working conditions for a law enforcement officer, not events that were, as the Supreme Court stated in *Payes II*, "inherent in police work." *Id*. at 553 (characterizing basis for award of benefits in case where the claimant was "exposed to abnormal working conditions, not events that were inherent in police work").

By contrast, the more numerous cases collected in *Payes II* where benefits have been denied to law enforcement officers all entailed incidents

occurring while the claimants were engaged in their law enforcement duties: responding to a call to assist officers who had been shot and seriously injured; involvement in a physical altercation arising from an attempt to serve a domestic violence arrest warrant; fatal shooting of an unarmed suspect followed by a grand jury investigation, indictment, trial and media attention; and involvement in an eight-hour standoff involving the officer, other officers, and a barricaded gunman. 79 A.3d at 553. The facts here fit more within the latter category rather than the former and convince me that this case does not present abnormal working conditions for a police officer in Upper Darby Township.

My conclusion here does not mean that "any incidents falling within the scope of a law enforcement officer's duties cannot also constitute an abnormal working condition" or disregard the "full convergence of events that transpired" in this case. Majority Opinion, slip op. at 29 n.10. I simply maintain that depending on the facts of a given case, what may be abnormal and even traumatic for many, even most, workers may not be abnormal for law enforcement officers in the course of their duties, which our Supreme Court recognized specifically in relation to physical struggles with suspects in *Payes II*:

> The Commonwealth Court also asserted: "Indeed, it is not beyond the realm of possibility for an officer to have to take someone's life." However, the court plainly meant here that a police officer might be called upon to take the life of a suspect during the course of a physical struggle in furtherance of upholding the law and ensuring the peace.
>
> . . . .
>
> [Payes, however,] did not have a "subjective reaction to [the] ordinary vicissitudes" of his job, but a reaction to a highly unusual and singular event.

79 A.3d at 582-83 & 586.

I note as well the Majority Opinion's reference to new Section 301(g) of the Workers' Compensation Act,[1] which provides that a post-traumatic stress injury, when claimed by a first responder, "shall not be required to be the result of an abnormal working condition to be a compensable injury under this [A]ct." Majority Opinion, slip op. at 34 n.12 (citing 77 P.S. § 415(1)). Unfortunately for Claimant, Section 301(g) expressly applies only to claims filed after October 29, 2025, and cannot be applied to this case where Claimant filed his claim in 2022.

I also note Senior Judge Leadbetter's Concurring Opinion in *Ganley v. Upper Darby Township (Workers' Compensation Appeal Board)*, --- A.3d ----, ---- (Pa. Cmwlth., No. 770 C.D. 2024, filed Oct. 22, 2025) (Leadbetter, S.J., concurring), slip op. at 1-2 (joining majority determination that firefighter who developed PTSD after unsuccessfully attempting to resuscitate two infants within a 16-month period established abnormal working conditions). Judge Leadbetter critiqued the "continued viability" of requiring all mental/mental claimants to show abnormal working conditions, not just first responders who will be exempt going forwards in light of new Section 301(g). *Id.*

This requirement does not derive from the Act; it is a "judge-made rule" adopted by the Pennsylvania Supreme Court decades ago when psychological conditions were more poorly understood and less likely to be accepted as compensable work injuries than they are today. *Id.*, slip op. at 2 n.1; *see Martin v. Ketchum*, 568 A.2d 159, 165 (Pa. 1990) (adopting "abnormal working conditions" requirement in mental/mental context). Judge Leadbetter suggested that the time has come to eliminate this rule, which reflects "ancient prejudices borne of lack of understanding" that are now "outdated and wrong." *Id.*, slip op. at 2. Here, Claimant

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of October 29, 2024, P.L. 1079, 77 P.S. § 415 (effective October 29, 2025).

has not raised and argued the ongoing validity of this rule as it pertains either to first responders or to all mental/mental claimants regardless of their employment. However, I agree with Judge Leadbetter in this regard, add my voice to hers, and would be open to revisiting this rule in a case where the question is properly before us.[2]

_____
CHRISTINE FIZZANO CANNON, Judge

---

[2] I recognize, of course, that as an intermediate appellate court, we are "bound by the decisions of the Pennsylvania Supreme Court and are powerless to rule that decisions of that Court are wrongly decided and should be overturned." *Zauflik v. Pennsbury Sch. Dist.*, 72 A.3d 773, 785 (Pa. Cmwlth. 2013) (quoting *Griffin v. Se. Pa. Transp. Auth.*, 757 A.2d 448, 451 (Pa. Cmwlth. 2000)).